fails. The lookout on the Hansa failed to do his duty. He did not report the Transporter when he discovered her, on the ground, as he alleges, that he supposed the captain and pilot then saw her. This, of itself, was great negligence on his part. Nothing, under such circumstances, should be left to conjecture. He should have reported the steamer at once, and it is possible that his failure to do so may have prevented the Hansa from changing her course, as she otherwise would, or, at least, might have done.

_____

## Case No. 6,037.

### The HANSA.

[5 Ben. 501; 6 Am. Law Rev. 759.][1]

District Court, S. D. New York. Feb., 1872.

COLLISION AT SEA—STEAMER AND BARQUE—LOOK-OUT—LIGHTS—FOG-SIGNALS—SPEED OF STEAMER.

1. The Norwegian barque R. was sunk, on May 31st, 1871, about 2.30 a. m., by a collision with the steamer H., at sea, about 350 miles from New York. The H. was bound to New York, heading west one-quarter north, and going at the rate of 9½ knots an hour. It was foggy at the time, having been so for some time, the fog being thinner and thicker at intervals, and the steam whistle of the steamer was being blown at intervals of about a minute between each three blasts. She kept an attentive lookout, but no sound was heard from the R. before the collision. The light of the R. was seen two or three points on the H.'s starboard bow. Orders to starboard the wheel and to stop and back the engine were at once given, but the H. struck the R. a square blow on her port side, cutting into her 18 feet, and sinking her at once and drowning eight of her crew. The bark was heading south half west, close hauled on the wind, which was about west southwest, and was making between three and four knots an hour. Her lookout was blowing a fog-horn at brief intervals. The whistle of the steamer was not heard till just as her lights were seen, and the collision immediately followed. The wheel of the barque was put to port just before the blow; but no change was made in the course of either vessel by the movement of their respective helms: _Held_, that the H. blew her steam whistle properly, and that the R. blew her fog-horn properly, and the fact, that neither signal was heard on the other vessel, was due to the fact that the vessels were approaching nearly at right angles, with the wind blowing the sound away, and to the noise of the wind and sea.

2. The testimony of those on the deck of the R., as to the direction of the wind, was more to be relied on than that of those on the deck of the H.

3. The fog-horn on the R. was a proper fog-horn, and was blown in a proper manner—by blowing, stopping to take breath and listen, and then blowing again.

4. The R. was not in fault in not having an additional lookout stationed forward, besides the man who was blowing the horn.

5. Although the R. was crossing the usual track of ocean steamers, that fact only imposed upon her the duty of exercising proper care and vigilance, and it was not a part of the ocean in which she had no right to be.

6. The fact, that the R. had but one man at her wheel, was no proof of negligence, or of want of seamanship on her part.

7. The lights of the R., which were in the mizzen rigging, were where they are customarily carried on Norwegian vessels, and the H. was not misled in any way by them.

8. It was the duty of the H. to keep out of the way of the R.

9. The burden was on the H. to excuse herself for not having performed that duty.

10. The rate of speed at which the H. was going was not a moderate rate, under the circumstances, and she was solely in fault for the collision.

[Cited in The Aleppo, Case No. 157.]

In admiralty.

Beebe, Donohue & Cooke, for libellant.

W. Q. Morton and W. W. McFarland, for claimants.

BLATCHFORD, District Judge. On the morning of the 31st of May, 1871, but a few minutes before half-past two o'clock, the German screw steamer Hansa, in the Atlantic Ocean, about 350 miles from the port of New York, came into collision with the Norwegian barque Rhea, striking her a square blow on her port side, between her mainmast and mizzenmast, and cutting into her to a distance of some eighteen feet. The barque had all her sails set, except her light sails, and was going three or four knots an hour, heading south half west, the wind being about west south west, and the barque being close hauled. The steamer was on a voyage from Bremen to New York, and the barque on a voyage from Rotterdam to New York. After the collision, which occurred in a fog, the steamer backed out from the barque, and the barque disappeared in the fog, towards the port hand of the steamer, and undoubtedly went down with her cargo. The value of the barque and her cargo are claimed to have been $160,000. The crew of the barque consisted of a master, two mates, a carpenter, a sailmaker, a boatswain, seven able seamen, an ordinary seaman, and a steward—fifteen persons at all. Of these, there were on deck at the time of the collision, the mate (who was the officer of the watch), the boatswain, the ordinary seaman (who was at the wheel), one able seaman (who was on the lookout), and three other able seamen—seven persons in all. Of these, the man on the lookout was lost. The other six and the second mate, who was asleep in a cabin on deck at the time of the collision, were saved, by getting on board of the steamer. The other eight of the fifteen perished with the vessel. The seven who were saved have all of them been examined as witnesses in the case. The per-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 6 Am. Law Rev. 759. contains only a partial report.]

sons on the deck of the steamer at the time of the collision were two lookouts, one on each bow; the second officer, on the bridge, and a boy there with him; the third officer, at the con compass, aft by the wheelhouse, and two quartermasters and two seamen in the wheelhouse—nine in all. She had on board a master, four officers, two boatswains, four quartermasters, thirty seamen—forty-one persons having duties on deck, besides sixty-four others, consisting of engineers, fire-men, coal-passers, cooks, stewards, boys, &c., making one hundred and five in all. All of the nine persons who were on the deck of the steamer at the time of the collision have been examined as witnesses, and also the master, the first officer, and the second engineer.

The libel alleges that, at and before the collision, the barque had a fog-horn blowing and sounding; that the barque kept on her course without variation until the steamer was close on board of her; that then, to ease the blow, if possible, the mate ordered the helm aport, but the collision took place before any change could be made in her course; that the collision was caused without fault on the part of the barque; that she had a proper lookout set, and a fog-horn blowing, and a good man at the wheel; that a full and efficient lookout was kept; and that the fault was in the steamer, in running at too great a rate of speed, in not keeping a good and efficient lookout, in not in time taking steps to avoid the barque, as it was the duty of those on the steamer to do, and in not stopping and backing in time.

The answer avers, that, during the time between midnight and half-past two o'clock, a. m., on the 31st of May, a drifting but not continuous fog was experienced, which had commenced some hours before, and had varied in the extent of its obscuration, from time to time lighting up and changing in character, and presenting thick and clear atmosphere alternately; that, during the prevalence of the fog, the Hansa was kept at a moderate rate of speed, part of the time as low as seven knots an hour, and at no time exceeding nine and a half knots, nine knots per hour being about the rate immediately before and at the time of the collision; that her rate of speed was regulated according to the circumstances; that, in view of the skill and care exercised, and the precautions taken, in navigating her, and of the reciprocal precautions required by law from other vessels, her rate of speed was at all times prudent and safe; that, during the half-hour immediately preceding the collision, blasts of her steam-whistle were sounded at intervals not exceeding at any time one minute and a half, lights of the most effective description were displayed, the most vigilant lookout was maintained, an officer of capacity and long experience was in charge of the deck, a force of four men—two able seamen and two quartermasters—was kept in the wheelhouse,

the most effective apparatuses for conveying orders from the officer in charge to the engine-room and the wheel respectively, were provided, thus creating a reciprocal duty on the part of approaching vessels to give notice of their location by proper sounds of their steam-whistles or fog-horns, the distance at which the Hansa's steam-whistle could be heard being at least two miles in much less favorable circumstances, and the distance at which ordinary fog-horns and steam-whistles on other vessels could have been heard by those on the Hansa being not less than two miles; that, under these circumstances, the speed of the Hansa was, in all respects, moderate, judicious, and safe, and did not in any manner contribute to the collision; that, while so proceeding, the steamer heading about west, and no answering blast of whistle or fog-horn, and no hail, having been detected, although attentively listened for, in the intervals between the blasts of the Hansa's steam-whistle and immediately after another blast of the Hansa's steam-whistle, a dim light, the color of which was not at first distinguishable, but which proved to be the red light of a vessel alleged to have been the barque Rhea, came into view, and was sighted and reported simultaneously by both lookouts on the bows of the Hansa; that the light bore about two points on the starboard bow of the Hansa, and indicated the dangerous proximity of a vessel, apparently under full sail, heading to the southward, across the bow of the Hansa; that, by immediate telegraphic orders from the bridge to the engine and wheel of the Hansa, her engine was at once stopped and backed, and her helm was put hard astarboard, but, before the heading or way of the Hansa could be materially affected thereby, a collision, inevitable to the Hansa, occurred, and the port side of the barque came in contact with the bow of the Hansa; that, as soon as the vicinity of the barque became known, every possible effort, on the part of those navigating the Hansa, was made, to avoid the collision; and that no fault was committed by them, and the collision was not caused by any fault or negligence on the part of those in charge of navigating the Hansa. The answer charges that the collision was occasioned by the negligence and unskilfulness of those in charge of the barque, and deficiencies in her equipment, and omissions of duty and of precautions, as follows: (1) The failure on the part of those navigating the barque to give due notice of her presence and approach, by sounding properly one or more fog-horns, as, had the same been so sounded, they must, necessarily, have been heard on board of the Hansa at a distance much further than was necessary to enable those on board of her to easily avoid any danger of collision at even a much greater rate of speed than she was then going; and, in the absence of such signal or signals on the part of the barque, to indicate

her presence and bearing, all precautions by those navigating the Hansa were, necessarily, unavailing to prevent a collision, and would have been so at whatever rate of speed the Hansa might have been proceeding. (2) The barque, at the time of the collision, was being navigated on a part of the ocean out of the usual course of sailing vessels. (3) Her master, officers and crew were not vigilant but negligent, in the performance of their duties, and were inefficient as to nautical competency, seamanship and number. (4) Before, and at the time of, the collision, no competent or effective lookout was stationed or maintained on the, barque. (5) Immediately before, and at the time of, the collision, the wheel of the barque was in the sole charge of an inexperienced and incapable boy, who was ignorant of the Norwegian language, in which language the usual orders for navigating the barque were given. (6) The lights on the barque were dim, defective, and placed on an unusual and improper part of the vessel, and, as so defective and misplaced, tended to mislead as to her true position and bearing. (7) There was a general neglect of discipline and proper precautions on board of the barque, and blasts of the steam-whistle sounded from on board of the Hansa were heard on board of the barque in ample time for her, by answering sounds of fog-horn and otherwise, to have notified those navigating the Hansa of the position of the barque, and enabled them to avoid a collision; and, through culpable negligence and want of seamanlike presence of mind, sagacity and promptitude on the part of those navigating the barque, no answering fog-horn or horns was or were sounded, or other measures resorted to, to notify the Hansa of her position; and the collision was due solely to the seven causes thus stated.

(After collating the evidence of the crew of the Rhea, the court proceeds): From the testimony of these six witnesses, comprising all the men who were on the deck of the barque at the time of the collision, except Larsen, who was lost, it is impossible not to believe that the fog horn was being blown from midnight down to the time of the collision, for the first hour by Jacobsen, for the second hour by Schmidt, and for the time after two o'clock by Larsen; and that there was one man (Jacobsen) on the topgallant forecastle, as a lookout, for the first hour, two (Danielson and Schmidt) for the second hour, and one (Larsen) during the time after two o'clock. Before and at the time the lights of the Hansa came out of the fog, Hansen (the mate) was standing by the mainmast, amidships, on the starboard side, Christophersen was on the starboard side by the main hatch, Evaldt was on the port side, amidships, Danielson and Jacobsen were between the forecastle and the foremast, and Schmidt was at the wheel. These men none of them heard any whistle from the steamer any considerable time before they saw her light come out

of the fog. To Hansen, the order of events was masthead light, whistle, green light. Danielson saw no light but the masthead light, and heard no whistle. Christophersen heard the whistle and saw the three lights simultaneously. Evaldt heard the whistle and saw the white and red lights simultaneously. Jacobsen saw the white light and then the colored lights, and heard no whistle. Schmidt saw no light and heard no whistle. The depositions of all of these men were taken within twenty-five days after the collision, and more than two months before the answer was put in.

On board of the Hansa, the second officer, Sander, whose watch it was, and who was on the bridge, saw the light of the Rhea from two to three points on his starboard bow, and that was the first he saw or heard of her. He could not tell the color of the light, but he telegraphed immediately to put the helm hard astarboard and to stop. Then, seeing the sails of the Rhea, he telegraphed to go back at full speed. The light was reported from the bow after Sander saw it and while he was stepping three steps to the telegraph. He puts the time between his seeing the light and the collision at fifteen seconds. No one on the deck of the Hansa heard any sound of any fog-horn or other noise from the Rhea. The steam whistle of the Hansa was being sounded from two o'clock down to the time of the collision, by giving three blasts, with intervals of about a minute between every three blasts. The starboarding of the helm of the Hansa did not change her course substantially at all before the collision.

(The court then collates the evidence given by the Hansa, showing that, on the voyage, she had run about 2,700 miles at the average rate of 11 knots an hour, and that she was, at the time of the collision, running 9½ knots, and proceeds): It being clear, on the evidence, that the fog-horn, though blown on the Rhea, was not heard on the Hansa, and that the whistle, though blown on the Hansa, was not heard on the Rhea, the Hansa, in endeavoring to discharge the duty incumbent upon her of excusing the collision, it being her business to keep out of the way of the Rhea, charges upon the Rhea, as a fault, that the fog horn was not properly blown or blown from a proper point on board of the Rhea, insisting that, otherwise, it would have been heard on board of the Hansa. The fact that, with the location of men on the deck of the Hansa, no fog-horn was heard from the Rhea, is urged by the Hansa as evidence that none was blown, or, that, if blown, it was not blown in a proper manner or from a proper place, while the fact that, with the location of men on the deck of the Rhea, no whistle was heard from the Hansa, is urged by the Hansa, not as evidence that none was blown, or, that, if blown, it was not blown frequently enough, but as evidence that those on the deck of the Rhea were not properly attentive to their duties. A more consistent

conclusion, and one which the court should strive to reach, if fairly deducible from the facts in the case, would be, that, the Rhea blowing her fog horn properly and her men attentive to their duties, and the Hansa blowing her whistle properly and her men attentive to their duties, circumstances existed which prevented the hearing by either of the signal from the other. The wind, according to the testimony from the Rhea, was west southwest and the Rhea heading south half west, she being, therefore, close hauled within five and a half points of the wind, and she was going between three and four knots an hour. She was bound to New York, and beating, and, therefore, sailing as close to the wind as she practically could. The Hansa had no sails set and was going nearly dead against the wind, at a speed of nine and a half knots an hour. Under these circumstances, the testimony of those on the deck of the Rhea, as to the direction of the wind, is much more to be relied on than the testimony of those on the deck of the Hansa. Sander, on the Hansa, says that, at the time of the collision, the Hansa was heading west one-quarter north, with the wind right ahead, a fresh breeze, and a moderate head sea running. If the wind was west one-quarter north, the Rhea would have been sailing seven points and three-quarters off of the wind, while her mariners state that she was close hauled on the starboard tack, and give her distance from the wind, thus close hauled, at five and a half points. I, therefore, accept the wind at five and a half points on the starboard bow of the Rhea, and two and a quarter points on the port bow of the Hansa. It was of such force that the Rhea, close hauled, made a speed of between three and four knots an hour. In addition to this positive velocity of the wind, two and a quarter points on the port bow of the Hansa, the Hansa was going through the air at the rate of nine and a half knots an hour, against this wind, and against a head sea, surrounded by the noise which would arise from the sea, and from the rapid passage by each other of the air and the wind, on the one hand, and of the vessel and her masts, spars, rigging and other appurtenances, on the other hand, and that noise which is always present on a steam vessel, even a screw, when in motion, at the rate of speed of the Hansa, but the presence of which is not marked by the ear accustomed to its presence, and only noted when it ceases. To the Rhea there were the wind and the sea two points and a half forward of her beam on her starboard side, with the noise from sea and wind which would exist. In addition to this, the Rhea was off to starboard of the Hansa. When the Rhea was half a mile from the place of collision, calling her speed three and a half knots an hour, the Hansa was one mile and eighteen hundred and eighty-five feet from the place of collision, or one hundred and twenty-five feet more than a mile and one-third, calling

her speed nine and a half knots an hour. When the Rhea was a quarter of a mile from the place of collision, the Hansa was thirty-five hundred and eighty feet from the place of collision, or sixty feet more than two-thirds of a mile. When the Hansa was a mile from the place of collision, the Rhea was nineteen hundred and forty-five feet therefrom, or one hundred and eighty-five feet more than a third of a mile. When the Hansa was a half a mile from the place of collision, the Rhea was nine hundred and seventy-two feet therefrom, or ninety-two feet more than one-sixth of a mile. When the Hansa was a quarter of a mile from the place of collision, the Rhea was four hundred and eighty-six feet therefrom, or forty-six feet more than one-twelfth of a mile. The course of the Hansa was nearly at right angles to the course of the Rhea. It angled only a quarter of a point forward of the beam of the Rhea, on the course of the latter. The Hansa was always farther off from the Rhea than from the place of collision. Under all the circumstances surrounding the case, it is not at all extraordinary that no warning signal was heard by either vessel from the other, although both vessels gave such signals properly and the hands on both were attentive and vigilant in listening for what could be heard.

The excuse set up by the Hansa, in her answer, that the collision was occasioned by the failure on the part of those navigating the bark to give due notice of her presence and approach by sounding properly one or more fog-horns, is disposed of by the foregoing considerations, and by others to be now alluded to. The fog-horn blown on the Rhea appears to have been a proper horn, and to have been blown at a proper place and in a proper manner. No whistle having been heard from the Hansa, there was nothing to call upon those on the Rhea to blow the horn especially in a direction towards the Hansa, if, indeed, it could have been so blown any more than it was. It was blown from the usual station of the lookout on such a vessel—the topgallant forecastle—and in the usual manner—by blowing, stopping to take breath and to listen, and then blowing again. Stopping to listen was necessary, nothing having been heard. Continuous blowing, if to be required at all, can only be required when called for in answer to a warning heard. Listening is as necessary as blowing. A second lookout can hear nothing from another vessel by listening, while the first lookout is blowing close to his ears. A single lookout can listen, if charged (as in this case) with that duty, during the intervals of blowing, as well as a second lookout can do so.

It was urged, on the part of the Hansa, on the strength of the testimony of some of the officers of the Hansa (the officers and men of the Hansa being the only witnesses on the part of the Hansa), that one stationed look-

out on a sailing vessel, in a fog, was not sufficient, if he was charged also with the duty of blowing the fog-horn; that one and the same man could not blow the fog-horn properly, and keep a proper lookout with his eyes, and give proper attention with his ears; and that a lookout stationed on the top-gallant forecastle of a barque like the Rhea, and there blowing the fog-horn, with the wind as it was, and with the sails trimmed to port, could not see to leeward, and could not make his fog-horn heard to leeward, because of the interference of the sails. On these subjects the libellant has called, as witnesses, seven shipmasters, disinterested persons, who have no connection with this controversy. All of them testify that the proper and usual station for a lookout, on a vessel like the Rhea, is on the top-gallant forecastle; and that on such a vessel it is not customary to have more than one man set as a lookout, in a fog. Four of them testify, that it is usual, on such a vessel, for the man who is set as a lookout to blow the fog-horn, if there is a fog. Five of them testify, that the blowing of a fog-horn does not interfere with seeing or hearing properly, during the intervals between the blasts, by reason of any effects produced by the effort of blowing. Four of them testify, that, in an ordinary barque, with such sails set as the Rhea had set, there is no obstruction caused by the sails to prevent a lookout on the top-gallant forecastle seeing on both sides. Three of them testify, that, in a fog, one lookout is better than two, because of the propensity which two have to talk together. The seven witnesses from the Rhea were not examined on these subjects. The libel was filed June 6th, 1871, and their depositions were taken June 20th and 24th, 1871. None of them were examined orally at the trial. The depositions of the witnesses from the Hansa were taken July 20th, 1871. The answer of the Hansa was filed August 29th, 1871. The attention of the witnesses from the Rhea was not called, on cross-examination, to any of the subjects just alluded to. Nor does the answer specifically take the point that the top-gallant forecastle was not the proper place for the lookout, or the point that there should have been two lookout men in the fog, or the point that the fog-horn should have been blown by another person than the lookout, or the point that the sight and the hearing of the blower are interfered with, during the intervals of blowing, as the effects of the previous effort of blowing, or the point that the sails of the Rhea, as trimmed, prevented the lookout on the top-gallant forecastle from seeing to leeward or making his horn heard to leeward. The answer contains, in respect to the Rhea, in the particulars alluded to, nothing but generalities, such as failure to sound a fog-horn properly, negligence in the performance of duties, inefficiency in officers and crew as to nautical competency, seamanship and number, an in-

competent and ineffective lookout, and general neglect of discipline and proper precautions. These allegations, such as they are, are not supported by the evidence, and the proofs show that, in respect to a lookout and the blowing of a fog-horn, there was no fault or negligence on the part of the Rhea.

To show that the lookout on the Rhea was not efficient in seeing or hearing, and did not blow his fog-horn properly, the witnesses from the Hansa give their opinions as to how far a light can be seen in a fog, and how far a steam whistle can be heard, and how far a fog-horn can be heard. The master of the Hansa states, that, while the white masthead light of the Hansa could be seen, in clear weather, at least six miles off, the distance at which it could be seen during a fog would be modified according to the density of the fog. Elsewhere, when asked if he can give any idea as to how far such white light could be seen in a thick fog, he says, that, if the fog was not too thick, the light ought to be seen two miles. He also says, that he should think the colored lights of the Hansa could be seen, in an ordinary fog, a mile or a mile and a half, probably. The first officer of the Hansa, who was the officer of the watch from eight o'clock until midnight, when asked how far the lights of the Hansa could be seen in an ordinary, moderate fog, says, that it is very hard to say how far; that, perhaps, in a moderate fog, the white light of the Hansa could be seen a mile off; and that, in such a fog as had prevailed at any time during his watch, he thinks such white light could be seen at least a mile. Sander, the officer of the watch on the Hansa, at the time of the collision, and who was on the bridge, says, that, in his judgment, the white light of the Hansa could be seen about a mile in such a fog as prevailed immediately before and at the time of the collision. Yet he elsewhere says, that the first he saw or heard of the Rhea was seeing her light bearing from two to three points on his starboard bow; that he could not tell the color of such light when he first saw it; that the vessels collided in not over fifteen seconds after he first saw such light; that he could not see the hull of the Rhea, but only her sails; and that, after the collision, the Rhea disappeared from his view at about half the length of the Hansa off—the Hansa being 367 feet long. This evidence, in connection with the fact that the red light of the Rhea was burning properly at the time of the collision (as more particularly mentioned hereafter), and was seen nearly as soon as it could be by the lookouts on the Hansa, and that the white light of the Hansa was not seen by any one of the men on the deck of the Rhea, stationed as before mentioned, until the vessels were almost in contact, is better evidence of how dense the fog was, and of the distance at which a light could be seen in a fog, than the speculations or opinions of witnesses tes-

tifying to relieve themselves from a charge of culpable negligence in the management of their vessel.

So, too, as to the steam-whistle. The master of the Hansa states, that the steam-whistle of the Hansa could, with a moderate breeze, be heard at least three miles to leeward, and at least one mile to windward. Sander says it can be heard about two miles, and he gives an instance of hearing it at a considerable distance, in the Hudson river, on a quiet day, on an occasion when he saw the vessel and the puff of steam also. But, from such evidence, and in the face of the evidence of those on the deck of the Rhea as to their hearing no sound of any whistle until they saw the Hansa's light, it would be going very far for the court to say that, on the ocean, with the wind and the sea as they were, and in the fog, the mariners of the Rhea must have been negligent, because they did not hear the whistle, although it was duly blown.

As to the fog-horn, the master of the Hansa testifies, that an ordinary tin fog-horn, a foot and a half in length, when properly blown, can be heard in clear weather at least two miles; and that, in a fog, you can sometimes hear better and sometimes not so well. Sander says, that such a horn, when well blown, in a calm, at sea, can be heard at from half a mile to a mile off; and that he thinks it could, in a moderate breeze, be heard twice as far to leeward. These opinions, in view of the facts and circumstances, before alluded to, existing to prevent the horn, though properly blown on the Rhea, from being heard by those on board of the Hansa, though vigilant, cannot be held to be a sufficient basis for concluding, either that the horn was not blown or that the lookouts on the Hansa were not vigilant. These considerations dispose of the postulate set up in the answer of the Hansa, that, if a fog-horn had been properly sounded by the Rhea it would necessarily have been heard on board of the Hansa at a distance much further than was necessary to enable those on board of her to easily avoid any danger of collision even at a much greater rate of speed than she was then going, and that, therefore, no fog-horn was properly sounded by the Rhea.

It is also set up, in the answer, that the collision was occasioned by the negligence and unskilfulness of those in charge of the Rhea, in navigating her, at the time of the collision, in a part of the ocean out of the usual course of sailing vessels. This defence, as thus broadly stated, amounts to the proposition, that the Rhea was an obstruction to the navigation of the Hansa, and had no business to be where the Hansa could hit her. Yet the view is moderated, in argument, to the proposition, that the Rhea was where sailing vessels are not usually found by steamers passing between New York and the English Channel, and that, therefore, the Hansa might justifiably go at a greater speed, in a fog, at the place of colli-

sion with the Rhea, than the speed which would be justifiable in a locality more frequented by sailing vessels. The master of the Hansa testifies, that he does not believe that the place of collision is exactly in the track of sailing vessels from Europe to New York, but that sailing ships, beating about, must get along as they can; and that he should think it must be unusual to find sailing vessels in that region, because, during three years' service on the Hansa, he had never met a sailing vessel in that locality. Sander testifies, that the Hansa was in the usual course of the steamers of that line from Bremen to New York; and that the scene of the collision was an unusual place for sailing vessels. It is also attempted to be shown, by the cross-examination of the witnesses from the Rhea, that her master had found, by sounding, that he had got upon the Banks, and too far to the north, and that he had headed to the southward across what he knew was the usual track of steamers from Europe to New York. This imposed upon the Rhea the duty of exercising proper care and vigilance, but it is impossible, on the evidence, to hold that it imposed upon her the duty of doing anything which it is shown she failed to do. The only possible view in which the fact of the Rhea's being found in a place where it is unusual to find sailing vessels can be of any importance in this case is in regard to the speed of the Hansa, which subject will be considered hereafter.

It is also set up, in the answer, that, immediately before and at the time of the collision, the wheel of the Rhea was in the sole charge of an inexperienced and incapable boy, who was ignorant of the Norwegian language, in which language the usual orders for navigating the vessel were given. Much stress is laid, in the evidence, on its having been bad seamanship, in the fog, to have but one person at the wheel of the Rhea, and that person the ordinary seaman, Schmidt, and it is sought to be inferred from that that there was a general want of proper seamanship on board of the Rhea. Schmidt was, at the time of the collision, within two months of being twenty years of age, and had been at sea three years. Bellmer, one of the lookouts on the Hansa, was twelve days older than Schmidt, and had been at sea six years. Meyer, the other lookout on the Hansa, was twenty-one years and three months old at the time of the collision, and had been at sea seven years. Schmidt had been for over nine months on a school-ship before serving on a vessel. He had been accustomed to take his regular turn at the wheel at night, alone. Although he did not understand Norwegian, the crew understood English and spoke it to him. The master spoke English. When the mate saw the Hansa's light, he called out to Schmidt to put his helm hard down, singing out, in English, as the evidence would show, "Hard down," and Schmidt put it hard down, and remained firmly at his post of duty until the collision

threw him from the wheel. It is not shown that any order was given to him in connection with the collision which he failed to obey, or that two men at the wheel on the occasion could have done anything which Schmidt did not do. The seven shipmasters before referred to testify that, in moderate weather, even in a fog, it is not customary to have more than one man at the wheel of such a vessel as the Rhea. The court cannot, on the evidence, hold that there were any circumstances of wind, sea, weather or fog, which made it incumbent on the Rhea to have more than one man at her wheel at the time of this collision, or made it improper that Schmidt should be at the wheel. It is not shown that anything more, or anything different, could or ought to have been done with her wheel, if several men had been at it. The evidence as to the usage rebuts any suggestion as to want of seamanship in having but one man at the wheel, while Schmidt is shown to have been competent for the purpose, alone, under the circumstances.

The answer also sets up, that the lights on board of the Rhea were dim and defective, and placed on an unusual and improper part of the vessel, and, as so defective and misplaced, tended to mislead as to her true position and bearing. It is abundantly proved, that the Rhea had her green and red side lights set and properly burning. Those lights were in the mizzen rigging. It is shown, by the testimony of the mate of the Rhea and the testimony of four of the seven shipmasters before mentioned, that it is customary, in Norwegian ships, to carry the side lights in the mizzen rigging. It is in evidence, that the port light of the Rhea was seen by the lookouts and the officer of the deck on the Hansa, and that it was seen burning by some of the crew of the Rhea after they had gone on board of the Hansa. The officer on the bridge of the Hansa says that he cannot say that he would have done anything different from what he did if he had known that the light which he saw was in the mizzen rigging of the Rhea. The answer does not set up that the position of the light misled, but only that it tended to mislead.

The answer also avers, that blasts of the steam-whistle sounded from on board of the Hansa were heard on board of the Rhea in ample time for her to have notified those navigating the Hansa of the position of the Rhea, and enabled them to avoid a collision, and that this was not done. This allegation is not established, but is disproved.

The consideration of this case might well stop here. The Hansa and the Rhea were proceeding in such directions as to involve risk of collision, and it was the duty of the Hansa to keep out of the way of the Rhea, and she failed to do so. The Hansa was approaching the Rhea so as to involve risk of collision, and it was the duty of the

Hansa to seasonably slacken her speed, and to seasonably stop and reverse, and she failed to slacken her speed in season, and she failed to stop and reverse in season. The Rhea kept her course. There was no danger to accrue to the Hansa from obeying the rules, and there were no special circumstances existing to render necessary any departure by the Hansa from the rules. The Rhea did not neglect to carry the proper lights or to make the proper signals, or to keep a proper lookout, or to observe any precaution required by the ordinary practice of seamen, or the special circumstances of the case. The burden being on the Hansa, under such circumstances, to excuse herself from fault, and she not having done so, condemnation of her necessarily follows. But I think it is shown affirmatively that there was fault on the part of the Hansa, in failing to observe the requirement to go at a moderate speed in the fog which prevailed.

The actual rate of speed of the Hansa at the time of the collision was nine and one-half knots an hour. That had been her speed for an hour and a half previously. Her average speed up to the previous noon, during the voyage, had been eleven knots an hour, using sails whenever practicable. From the previous noon, without sails, her speed had at no time exceeded ten and one-half knots. The answer avers, that, during the prevalence of a drifting but not continuous fog, which commenced some hours before the midnight previous to the collision, the Hansa was kept at a moderate rate of speed, part of the time as low as seven knots an hour, and at no time exceeding nine and one-half knots, nine knots per hour being about the rate immediately before and at the time of the collision. These statements are not borne out by the evidence from the log-book of the Hansa. On the contrary, of the fourteen logs at the fourteen even hours between the time of the collision and the previous noon, there was no rate of nine knots, there were two logs at nine and one-half, six logs at ten, four logs at ten and one-half, and two logs, namely, at 7 p. m. and at 8 p. m., at seven. The master of the Hansa testifies, that he would consider ten miles a very moderate kind of speed for a vessel like the Hansa, on a night when there was a thick fog at times and lighting up at times, and in the location where this collision occurred. Her speed from the noon before the collision until the collision averaged, taking the log rates, a little under nine and two-thirds miles an hour, without sails, her speed at the time of the collision being nine and one-half. From noon of the 29th to noon of the 30th, with fore-and-aft sails, gaff-topsails and stay-sails set for twenty-two hours, she ran at the average rate of nearly eleven and one-tenth miles an hour. Yet her master testifies that, during part of the time, on the day preceding the collision, the fog was steadily very heavy; that,

during that time, the rate of speed they made was from about six and one-half to seven miles; that, when the fog was thick at times and lighting up at times, their speed was about nine and one-half miles; and that he regards those rates of speed as prudent rates, under the circumstances. He says, that, during the 29th and 30th, the weather was sometimes very thick and sometimes lighter, mostly cloudy, dark weather, with rain and fog; that, when he went to bed, two hours and three-quarters before the collision, the weather was quite clear; and that he had not been in bed before for more than thirty-six hours. Sander, the second officer of the Hansa, testifies, that, in his judgment, the speed of the Hansa, nine and one-half knots, at the time of the collision, was a moderate and prudent rate of speed for her on such a night, heading as she was, and with the wind, sea and fog such as they were. He says that it began to get thick soon after midnight, and continued getting thicker and lighting up until the time of the collision. The fog was such that the Hansa kept her whistle blowing at the same intervals from before half-past twelve until the collision, and that Sander lost sight of the Rhea, after the collision, when the Rhea was about half the length of the Hansa away from the Hansa, that is, about 185 feet off.

It is urged, on the evidence, that a steamer steers better when going at a quick rate of speed than when going at a slow rate of speed; that a steamer making a given rate of speed, with only sufficient steam for that rate, cannot be stopped in any less distance than when making double that rate, with sufficient steam for such double speed; and that the Hansa could be brought to a full stop, when going at the rate of nine and a half knots an hour, in the condition of things as they were at the time of the collision, in, as her master thinks, less than twice her own length, and in, as Sander thinks, from two to three times her own length, her length being 367 feet.

The evidence shows, that there was no difficulty in managing and steering the Hansa at a much less rate of speed than nine and a half knots, for, after the collision, she moved around in a circle of a half or three-quarters of a mile in diameter, for a considerable time, at a speed of four miles an hour, and sometimes less, sometimes stopping entirely, searching for traces of the Rhea. There is no doubt, that a steamer, or any other vessel, will answer her helm more readily, so as to avoid a given object ahead by actuating the helm, at a less distance off from such object when she is going at a higher speed than when she is going at a lower rate. But this has nothing to do with the control exercised by her steam machinery to stop her headway and give her stern way. That control is more effective at the lower speed. Not that five knot steam will give her stern way, when her speed is five knots only, any sooner than ten knot steam will give her stern way when her speed is ten knots. But, a steamer with boiler capacity for steam for ten knots, and whose usual rate is ten knots, in clear weather, can, from running at ten knots, with ten knot steam, reduce her rate to five knots, in a fog, and so manage her fires, and have in reserve a force of steam, as to be able to apply, in aid of obtaining stern way, in an emergency, a greater power of steam than that used to go ahead at five knots, and thus avoid a collision at five knots which could not be avoided at ten knots. It is the duty of a steamer to avail herself of her boiler power to be ready to stop and reverse with power and efficiency in a fog, while at the same time she moderates her speed so as to enable such power to be exercised with efficiency, and with greater efficiency than if she did not moderate her speed. That is the meaning of the rule that a steamer shall, in a fog, go at a moderate speed. It is that she may avail herself of the power which belongs to a steamer to go directly astern in spite of wind and waves, and thus avoid collisions which no vessel but a steamer can avoid. Hence it is the steamer that is to keep out of the way of the sailing vessel, and she is to do it by moderating her speed in a fog.

Independently of the question of avoiding entirely another vessel, a collision at a less rate of speed may be very much less disastrous. There may be time to give a slanting blow. In the present case, a considerably less rate of speed in the Hansa would probably not have cut the Rhea nearly in two, or, the light of the Rhea being seen at the same distance it was, the Hansa's helm might, at the less speed, have sheered her so as to give the Rhea a glancing, and, perhaps, not a necessarily fatal, blow.

In regard to the distance in which the Hansa could be brought to a stop, when going at the rate of nine and a half knots an hour, the evidence given is purely a matter of speculation and opinion. It is not stated to be the result of experiment or even observation. It is not given by an engineer. It is given solely by the master of the Hansa and the officer of her deck, the persons responsible for this collision, and for the loss of property and of life attendant upon it. But, even if it should be assumed to be possibly true, it amounts to nothing. In the first place, plunging on through the fog, as the Hansa was, with a fresh breeze nearly ahead, and a head sea, at the rate of nine and a half knots an hour, with the attending circumstances before referred to, which made it impossible to hear her steam-whistle on the Rhea, and impossible to hear the fog-horn of the Rhea on the Hansa, a capacity to be brought to a full stop in a distance so great even as that suggested was of no service. There should have been a capacity to be brought to a full stop in a less distance.

There would have been such capacity if the speed had been less than nine and a half knots, with the proper reserve of steam power ready to be instantly commanded, to reverse with the utmost efficiency. It is a self-evident proposition, that if, with a reserve force of steam ready to be used, but not in use, and the throttle-valve only partly open, a speed be maintained less than that which would result from having the throttle-valve wide open, the vessel can, by reversing, with the throttle-valve opened wide, be brought to a full stop in a less distance from the lesser speed than from the greater speed. No proposition to the contrary of this is sought to be maintained by any evidence. Instead of that, this question, and this alone, is put, not to any engineer, but to Sander, the officer of the deck on the Hansa: "Assuming that a steamer is making five knots an hour, with sufficient steam for only that rate of speed, can she be stopped in a greater or less distance than a steamer going ten knots, with steam enough for going at that rate of speed?" He answers: "It will take the same time to stop her." The premises being irrelevant, the conclusion is equally so.

It is the more incumbent on these large steamers, of great speed, weight and momentum, to go at a moderate speed in a fog, in order to be ready to reverse with more power than that used in their onward movement, because of the almost certainly fatal consequences to anything which they hit with a direct blow, as in this case, where the Hansa cut into the Rhea to a distance of eighteen feet. The probability of serious injury to such a steamer in a collision with a sailing vessel is so comparatively small, that the steamer, feeling safe herself, takes precautions in a fog substantially only in reference to other steamers. The probability of serious injury to a sailing vessel in a collision with such a steamer is so comparatively great, that the steamer should take extraordinary precautions in a fog, especially in moderating her speed, and making that moderate speed efficient by being ready to reverse with a greater power than that used in her onward movement.

The propositions maintained on the part of the Hansa, as to speed, are, that, if her speed did not exceed such a rate as would admit of her being stopped after being warned that another vessel was in her way, she was going at a prudent and allowable rate; that this test depends on the distance within which she could be stopped, and the distance at which she was entitled to expect warning that another vessel was in her way; that, if she could be stopped within the distance at which such warning was to be expected, her speed was not unreasonable; that such distance is to be taken at the usual reach of the customary warning; and that any other rule will destroy rapidity of communication by steam across the ocean, and interfere with the rap-

id transit of merchandise and of the mails, which has become a necessity. It is sufficient to say that no such rule of speed has ever been established or recognized by any admiralty court. It would put all sailing vessels, even though complying with all the rules of navigation, wholly at the mercy of these large and powerful steamers, with no chance of redress. If the steamers will persist in going at these rapid rates in fogs, they must take the risk upon themselves and bear the consequences, and not throw the risk upon those whose lives and property they destroy. I had occasion in the case of The Chancellor [Case No. 2,589] to express what I regard to be the settled views of courts of admiralty on this subject, and it is well, in view of the continued and persistent recklessness of steamers, to repeat those views. One of the witnesses for the claimant in that case was the master of a steamer plying regularly between New York and Liverpool. He said, that, while crossing the Banks in a fog, it was not his custom to diminish his rate of speed at all; that he generally went ten or eleven knots an hour, through a fog, on the Banks; and that from three hundred to four hundred yards was the furthest distance at which a fog-horn or a bell could be heard. On this testimony I made these observations: "This practice, if it be one, of not diminishing speed in a fog on the Banks, is directly, so far as steamers are concerned, in the face of the 16th article of the sailing rules, which provides that every steamship shall, when in a fog, go at a moderate speed. * * * Two prominent ideas were advanced by the witnesses for the claimant in this case, as justifying undiminished speed in a fog on the Banks. One was, that the danger to any vessel in a fog is greater the longer she remains in the fog. The other was, that the faster a vessel is going, the more quickly will she mind her helm, and thus the better will she be able, on a signal of danger, to avoid colliding with another vessel in a fog. Neither of these ideas has any sanction in the law, and any vessel which acts upon them takes upon herself the consequences of recklessness. The first idea disregards wholly the rights and the safety of other vessels. The other idea presupposes that a signal of danger proceeding from a vessel unseen in a fog, to another vessel, will necessarily be heard so seasonably, and acted upon so intelligently, by the latter, as to secure, by a proper movement of her helm, the avoidance of a collision."

A review of the principal cases on the subject of speed in a fog will show, not only that no such rule as that contended for on the part of the Hansa has ever been laid down or sanctioned by courts of admiralty, but that the rule which is applied has not been relaxed in view of the increase of intercourse by steamers, and of the enlargement of the size and power of steamers.

In The Rose, 2 W. Rob. Adm. 1, 3, in 1843,

Dr. Lushington said: "It may be a matter of convenience that steam vessels should proceed with great rapidity, but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered." He reiterates this view in the cases of The Virgil, 2 W. Rob. Adm. 201, 205; The Iron Duke (1845) 2 W. Rob. Adm. 377, 385; and the Juliet Erskine (1849) 6 Notes Cas. 633, 635. The same view was taken in the case of The Londonderry, 4 Notes Cas. Supp. 31, 45, and by the supreme court of the United States in Newton v. Stebbins (1850) 10 How. [51 U. S.] 586, 606; McCready v. Goldsmith (1855) 18 How. [59 U. S.] 89, 91; and Rogers v. The St. Charles (1856) 19 How. [60 U. S.] 109, 112. It was enforced in The Northern Indiana (1853) [Case No. 10,320]; The Batavier (1854) 9 Moore, P. C. 287, 297, 40 Eng. Law & Eq. 19, 25; and Amoskeag Manuf'g Co. v. The John Adams (1860) [Case No. 338].

In The Great Eastern, in the privy council, in 1864 (11 Law T. [N. S.] 5, 8, and Holt's Rule of the Road, 167, 180), it is said: "Their lordships do not mean to lay down any rule beyond that expressed in the regulations themselves, as to the occasion when a steam vessel is bound to moderate her speed, or as to the rate which, in the circumstances described in the evidence, she ought not to exceed; but their lordships are of opinion, that it is the duty of the steamer to proceed only at such a rate of speed as will enable her, after discovering a vessel meeting her, to stop and reverse her engines in sufficient time to prevent any collision from taking place." This was the principle adopted by this court in the case of The D. S. Gregory (1868) [Case No. 4,099], where the D. S. Gregory, a steamer, came into collision with a vessel at anchor, and where it was said, that the fact that the steamer, while under way in a fog, collided with the vessel at anchor, which used all proper precautions to give notice of her position, was sufficient evidence that the speed of the steamer was not moderate, there being no special circumstances existing in the case to justify her in maintaining the rate of speed she did; that, in such a fog, her speed ought to have been as much less than it was as would have been sufficient to enable her to avoid the vessel at anchor; that she ought not to have gone so fast as not to have been able, by slowing, stopping and backing, to avoid a collision; and that, if the fog was so thick, that, at the speed she had, with all the precautions she used, she could not avoid the collision, the conclusion was irresistible, that her speed was not that moderate speed in a fog which was required by the well-settled rules of navigation. The same principle was again applied by this court in the case of The Louisiana (1868) [Case No. 8,537], and in The Bristol (Dec., 1870) [Id. 1,890].

In the case of Dolner v. The Monticello [Case No. 3,971], in the circuit court for the Massachusetts district, before Clifford and Shepley, JJ., where a steamer, running not less than eight miles an hour, in a fog, collided with a sailing vessel, in the ocean, thirty to forty miles from Cape Lookout, the court say: "The only rule to be extracted from the statute, and a comparison of the decided cases, is, that the duty of going at a moderate rate of speed in a fog requires a speed sufficiently moderate to enable the steamer, under ordinary circumstances, seasonably, usefully and effectually to do the other things required of her in the same clause of the statute, namely, to slacken her speed or, if necessary, to stop and reverse."

In the case of The Blackstone [Case No. 1,473], in the district court for the Massachusetts district, in November, 1870, where a steamer ran down a sailing vessel, in a fog, in the Vineyard Sound, Judge Lowell held, that the steamer, in running at her usual speed, took the risk of meeting any other vessel properly navigating, and further said: "I do not place much reliance upon the evidence, though not contradicted, that a slower speed would have made no difference. It was well suggested, at the argument, that it might at least have enabled the lookout to hear the fog-horn sooner, because the noise at the steamer's bow would have been less; and it is by no means clear that it would not have enabled the steamer to avoid the libellant's vessel after she was seen. Even an expert must speak very cautiously to such a question, which involves a very close calculation of what a steamer can do in a given time, because no one is in the habit of timing them exactly, and a difference of a few seconds changes the whole aspect of the question. The statute undoubtedly assumes that a slow speed conduces to safety, and there is nothing in this case that should take it out of such a general rule, unless it be that the fog was unusually dense, or the steamer particularly difficult to manage, in either of which cases the necessity for caution was all the greater. I should be glad to see the experiment tried by a steamer, of moderating her speed in a fog, but I have hitherto found that they do not consider it to be important. If it is not, they should procure a change of the law."

A very instructive case on this subject is that of The Pennsylvania, in the privy council, in June, 1870 (23 Law T. [N. S.] 55). The Pennsylvania, a screw steamer, running in a line from Liverpool to New York, collided, in a fog, in the day time, with a barque, about two hundred miles to the eastward of Sandy Hook, while on a voyage to New York. There was a fresh breeze from the south southwest, and a heavy swell, the speed of the steamer was about seven knots per hour, her steam whistle was being sounded at proper intervals, she was steering west by south, and she was keeping a careful lookout. The barque was heading to the southward

and eastward, and making about a knot an hour, her helm being lashed alee. The barque was seen by the steamer about a length of the steamer off on her starboard bow, the helm of the steamer was put hard aport, and her engines were stopped and reversed. She struck the barque with her stem. The barque had been sounding a bell (instead of a fog-horn), which bell was heard on board of the steamer at about the same time the barque came into view. The court of admiralty held that the barque, being under way, ought to have sounded a fog-horn, and not a bell, but that the use of the bell instead of the fog-horn did not occasion or contribute to the collision; that there was no fault in the barque; and that the collision was caused wholly by the wrongful porting of the steamer and by her improper rate of speed. The privy council affirmed the decision, holding that, if the collision was inevitable when the vessels first came in sight, it was the fault of the steamer for going at an improper rate of speed; that the collision was not occasioned by the absence of blowing the fog-horn of the barque; that if, on the evidence, the fog-horn would have been heard further than the bell, it would not have been heard at a sufficient distance to have enabled the steamer to avoid getting into that position; that, in a thick fog, in the Atlantic Ocean, in the direct line to New York, about two hundred miles to the east of Sandy Hook, seven knots an hour is too great a speed for a steamer to proceed at; that, as against the view that a less speed than that would paralyze mercantile transactions and interfere with business and trade, in the carriage of passengers and goods, the lives of passengers and the safety of goods must be protected in the first place; and that, even if these fogs should last longer than they are said to do, still the steamers must abate their speed, and, if they do not, they must take all the consequences of a collision. See, also, on this point, Rogers v. The St. Charles, 19 How. [60 U. S.] 108, 112.

The case of The Westphalia [Case No. 17,-466], in 1871, in the district court for the Eastern district of New York, holds the same views. The steamer, in a thick fog, the breeze being very light and the sea calm, collided, in a thick fog, in the day time, in the English Channel, with a brig. The steamer was whistling every fifteen seconds, and had slowed her speed to from eight to ten knots an hour, and her lookout and other precautions were proper. The brig came in sight from 150 to 160 feet distant, no sound from her having been previously heard. The engine of the steamer was at once stopped and reversed, and her helm was hove hard aport, but the vessels were in contact before she could be stopped or her course materially changed. The brig was sunk. The brig had blown a fog-horn after hearing the steamer's whistle, but had not blown it before. The court held that the steamer was not in fault for porting, but was in fault for running at a speed of nine or ten knots an hour, in a dense fog; that a speed of seven knots could not be justified; that, although the steamer would answer her helm more quickly when going at eight or ten knots than at six, she could not stop so quickly; that, in such a dense fog, she was bound to be going as slow as it was possible for her to go consistent with steerage way, in order to enable her to stop in proper time; that she was in fault for not doing so; that the brig was in fault in not sounding her fog-horn before she heard the steamer's whistle; and that the damages ought to be apportioned.

In the case of the Magna Charta, in November, 1871, before the privy council (25 Law T. [N. S.] 512), which was a collision between two steamers, in a fog, in the day time, in the Baltic Sea, both steamers having been sounding their whistles, one of them going at the rate of one and a half knots an hour, and the other at the rate of from four to five knots an hour, the vessels having become visible to each other at seventy yards distance, the latter having cut into the former to the distance of eleven feet, and the fog being so thick that a vessel could not be seen more than a ship's length off, both the court of admiralty and the privy council held that the speed of from four to five knots was too great.

The result of all the authorities is, that, while the justifiable rate of speed will depend upon the circumstances of the case, there is no such criterion as that the steamer may go at a rate such as will enable her to stop within an assumed distance at which she may, under favorable circumstances, expect to hear a fog-horn or a steam whistle, if blown. The present case illustrates the folly of such a test. Neither vessel heard the signal of the other. Yet, on the evidence, each gave the proper signal. The barque could do nothing but what she did. The steamer could easily have been going at less speed.

I forbear to remark on the lookout kept on the Hansa, in view of the speed she was going at. The officer on the bridge saw the light of the Rhea before it was reported by the men on the lookout on the bow. If the Hansa's speed had been less, and the light of the Rhea had then been reported as soon as a vigilant lookout on her bow could see it, and her helm had then been starboarded, and her engines had at the same time been reversed, it might well have been that the collision would have been avoided, or at least have been less disastrous. But I put the decision as to affirmative fault in the Hansa on the ground solely of the Hansa's speed not having been, under the circumstances, that moderate speed, in a fog, required of her by the rules of navigation. There must be a decree for the libellant, with costs, with a reference to a commissioner to ascertain the damages.