## THE PATRIA.

(Circuit Court of Appeals, Second Circuit. January 8, 1901.)

### No. 28.

1. COLLISION—FOG—STEAMER AT FAULT—LOOKOUT.

A schooner, sailing closehauled at the speed of about three knots an hour, came into collision with a steamer, about 20 miles off Fire Island, in a thick fog, about 2 p. m. When the fog set in about half an hour before collision, the steamer slackened to half speed, which was about seven knots, and the only lookout prior to the collision was the first lieutenant, who stood on the bridge. The lieutenant heard the schooner's fog horn, and, looking in the direction from whence the sound came, saw the schooner's topmast on the starboard side, whereupon, at his signal, the steamer was at once reversed full speed, and three blasts of the whistle blown. The distance between the schooner and the steamer, when first seen, was about 80 meters. The schooner executed no maneu-

ver after hearing the whistles of the steamer, and the schooner's master testified that the steamer was about 600 feet away when he first saw her. The seamen of the steamer, located forward of the bridge, did not see the schooner prior to the reversing of her engines, but were engaged in other work, and were not on the lookout. *Held*, that the steamer was at fault for the collision in failing to maintain a proper lookout in the crow's nest or forward of the bridge.

**2. SAME—SCHOONER ALSO AT FAULT.**

The schooner was also at fault for failure to attempt to avert the collision by luffing as soon as the steamer's signals were heard, in violation of the international rules (Act Aug. 19, 1890; Act May 28, 1894), declaring that when, in consequence of thick weather, the vessel entitled to hold her course finds herself so close that a collision cannot be avoided by the action of the giving-way vessel alone, she shall take such action as will best aid to avert collision.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel for collision.

For opinion of district court, see 92 Fed. 411.

These are cross appeals from a decree of the district court, Southern district of New York, holding both vessels in fault for a collision which took place off Fire Island, a little before 2 p. m., September 5, 1898, between the schooner Frances M., of 1,096 tons register, and the Patria, an iron screw steamer of 2,200 French tons register.

Eugene P. Carver, for libelants.

Robert D. Benedict, for the Patria.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Upon some of the issues there is considerable conflict of testimony. Where this exists, this court will naturally incline to sustain the finding of the district judge, who tried the cause and saw the witnesses. Briefly stated, the essential facts are these: The schooner was sailing closehauled, on the starboard tack. The wind was light from W. N. W., and she was heading S. W. by S., making, in the opinion of her master, including leeway, a true course of from S. S. W. to S. by W. She was going not over three knots. The Patria was on the usual course of steamers bound for New York in that locality,—west. About 1:30 p. m. a fog set in, which thickened over the water, though remaining somewhat light overhead. When the fog set in the half-speed signal was rung to the steamer's engine, and thereafter the whistle was blown at intervals of a minute. The speed of the steamer is in dispute. She contends that it was 5½ knots. The district judge reached the conclusion, by inference from facts which he found, that it was 7 knots. While thus proceeding, the first lieutenant, who was on the bridge and at the moment in charge of the navigation, the captain having gone to his room to get a heavy coat, heard a fog horn on the starboard hand, and, looking in the direction whence it came, saw the schooner's topmast. He at once rang the telegraph to the engine room to back the engine at full speed, the helm hard a-port, and gave three blasts on the whistle. Almost immediately the captain repeated the orders to the engine room, and himself blew three blasts. The testimony from

the steamer gives the distance at which the schooner was first heard and seen at about 80 meters. The first signal to the engine room was at once obeyed, and the Patria was under reversed engines, full speed, until collision. No other maneuver was executed by her, but the re- versed screw threw her head about three points to starboard. The schooner heard the whistles of the Patria before she sighted her. How often is much in dispute. Her master stood between the main and mizzen rigging, and tried to locate the sound. To him the steam- er appeared out of the fog coming just about abeam, on a little angle forward towards the schooner's bow. He estimates that she was 600 feet away when he first saw her. No maneuver was executed by the schooner. The vessels came together, the steamer striking the schoon- er a little abaft the foremast, cutting into her waterway about 12 or 14 inches. As the vessels came apart after the impact, the schooner proceeded on her starboard tack across the steamer's bow. Thereaft- er she tacked in order to keep the injured part out of water.

The district judge found the steamer in fault for excessive speed and for not having a proper lookout. It is unnecessary to discuss the first of these assigned faults. We are inclined to the opinion that her speed was not quite so great as the district judge found. As to the other fault, there is no dispute as to the facts. The only sta- tioned lookout was on the bridge, about 30 odd meters from the stern, for the reason, as the captain states, that "in foggy weather you can see much better from the bridge than you can from down forward." There were men working on the forward part of the ship. One sea- man, Huertel, was cleaning a winch at the foremast between the bridge and the forecastle. From where he stood he could not see over the forecastle without standing on the winch. There were some passengers on the port side near the rail, laughing and singing. He neither heard nor saw her until after the lieutenant began maneuver- ing with the telegraph. Another seaman, Hamon, was cleaning winch No. 2, forward side. He saw and heard nothing of the schooner until after he felt the reversing motion of the steamer. A third seaman, Furet, was cleaning the forward winch at top-gallant forecastle, sim- ply attending to his duties, not trying to look out. He did not see or hear the schooner until after the reversing signal sounded. One pas- senger, somewhat scared at the fog, was standing on deck within a yard or two yards of the bridge stairs. He saw the schooner appar- ently about the same time as those on the bridge. Another passen- ger, Di Lauro, was standing on the deck near the starboard rail, quite near the forecastle. He saw the schooner all at once, not "the sails before the hull," but heard nothing from her.

The necessity of a stationed lookout (or lookouts, if the exigency arises for more than one) is well recognized in the authorities, and it has been held a fault calling for condemnation when a vessel fails to maintain one equal to the emergencies likely to arise in a dark night or when there is a dense fog. The Colorado, 91 U. S. 698, 23 L. Ed. 379. It is true that vessels have frequently been relieved from con- tribution when it has appeared that the imperfection or even absence of a lookout in no way contributed to produce the collision; but that must be very plainly apparent. Here we have a case where the hid-

den schooner was first heard and seen by those on the bridge when she was about 80 meters distant. There was no lookout in the crow's nest nor in the bows; and who can tell that, even though the fog was heavy below and lighter above, one thus placed would not have heard one, at least, of the earlier blasts of the schooner's horn, and thus given a warning which, by stopping the engines, would have made their subsequent reversal much more quickly effectual in giving stern-way? The fact that the unskilled passengers, and the seamen, whose attention was occupied with other things, heard and saw nothing, is not persuasive that nothing would have been seen and heard by a look-out, a hundred feet or more forward of the bridge, sufficiently earlier to give the few seconds necessary to avoid the catastrophe; for the evidence satisfies us that, even if the steamer was not actually stopped at the moment of impact, she was moving so slowly that a few feet, or a few seconds, would represent the margin between collision and safety. We concur with the district judge in holding the steamer in fault for failure to keep any stationed lookout forward of the bridge.

The schooner was held in fault for failing to take any action to avert collision. She was the privileged vessel, and she held her course. The international rules in force at the time (Act Aug. 19, 1890; Act May 28, 1894) provided that (article 21):

"Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed. Note.—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision can not be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

The district judge has fully discussed this branch of the case. It is quite plain upon the proof that, while the vessels were some 270 feet apart, the steamer apprised the schooner by her three-whistle signal (which the schooner's master says he "does not remember he heard") that she was backing her engines, although she was herself still moving forward, and that every foot the schooner might gain to the westward would be a step towards averting the collision. Under these circumstances, the amended rule required her to make the effort, by luffing, to creep as much further away as she could; and, despite the fact that she was going slowly, and could not expect to run up into the wind as nimbly as she might have done had it been fresher, the Patria at the moment of impact was so near to gathering sternway that it seems a fair inference the collision would have been avoided or reduced to trivial results. The circumstances that the schooner, despite the push to windward which her bow received from the blow, continued on her course, and that she tacked immediately afterwards, are persuasive to the conclusion that she had headway enough to edge herself a little further to the west.

Upon the questions presented as to the propriety of certain items of costs, we concur in the opinion of the district judge. The decree of the district judge is affirmed.