## THE SAGAMORE.

### (Circuit Court of Appeals, First Circuit. November 15, 1917.)

### Nos. 1157–1159.

1. **ADMIRALTY** &75—**EVIDENCE—ADMISSIONS IN ANSWERS TO INTERROGATORIES.**

     An admission as to the speed of a steamer libeled, contained in the answer to libelant's interrogatories, which answer was verified by the master of the steamer, the claimant, must be given weight.

2. **COLLISION** &82(2)—**FOG—SPEED.**

     Under International Rules Act Aug. 19, 1890, c. 802, art. 16, 26 Stat. 326 (Comp. St. 1916, § 7854), declaring that every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions, a steamer, proceeding through a fog, should reduce its speed to such a rate as would enable it to stop in time to avoid a collision after an approaching vessel comes in sight, provided an approaching vessel is herself going at the moderate speed required by law, the lowest speed consistent with good steerageway being required under such condition, and the steamer being bound, if unable to reduce her speed sufficiently with the continuous action of her engines, to occasionally stop them, and so a steamer, proceeding through a dense fog at the rate of 5½ knots an hour, at a point where fishing vessels were to be expected is liable for a collision; the rate of speed being such that the steamer could not be checked after discovering a fishing vessel in time to avoid the accident.

3. **COLLISION** &82(1)—**FOG—SPEED.**

     The inability of a particular vessel to go slow and maintain steerageway will not excuse it for proceeding at greater than a moderate rate of speed through a dense fog.

4. **COLLISION** &82(2)—**FOG—SPEED.**

     The rules requiring moderate speed in a fog should be strictly construed in favor of fishing vessels and against steamers proceeding through known fishing grounds; the risk to the fishing vessels being great and that of steamers slight.

5. **COLLISION** &82(1)—**FOG—SPEED.**

     In determining within International Rules, art. 16, what is a moderate speed in a fog having due regard to existing circumstances, the interpretation of the rule by maritime courts will control the judgment and discretion of navigators.

6. **COLLISION** &82(1)—**SPEED IN FOG—MODERATE SPEED.**

     In determining whether there has been a compliance with International Rules, art. 16, requiring a moderate speed in fog and a proper exercise of the discretion of the navigator as to general speed, one of the conditions

&For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to be taken into account is the statutory requirement of proper signals to be given by other vessels; but ordinarily a steamer's speed in a fog cannot be held moderate, where it does not admit of her coming to a full stop within her share of the distance which separated her from another vessel, after the latter's signal was audible.

7. COLLISION &⟶82(2)—Fog—MODERATE SPEED.

In determining the liability of a steamer for a collision in a fog, both the obligation to go so slow as to be able to avoid a vessel which can be sighted, as well as the right to maintain steerageway, should be applied, so far as possible, though the two obligations approach inconsistency.

8. COLLISION &⟶81—Fog—SIGNALS.

A fishing schooner run down by a steamer in a fog held not at fault, though the schooner's fog horn was lashed, for failing to promptly turn the horn toward the approaching steamer; sufficient signals being given.

9. COLLISION &⟶48—STEAM VESSELS—BURDEN OF PROOF.

Where a steamer ran down a sailing schooner, the burden of showing freedom from fault is on the steamer; it being its duty to avoid the sailing vessel.

10. COLLISION &⟶81—Fog—LOOKOUTS.

The denser the fog and the worse the weather the greater cause for vigilance, and a vessel cannot excuse the failure to maintain a lookout on the ground that the weather was so thick that another ship could not be seen until actually in collision.

11. COLLISION &⟶81—Fog—LOOKOUTS.

As the lookout is both the eyes and ears of a ship, a steamer which ran down a sailing schooner is at fault for failure to maintain a lookout at the forecastle head, which was but 25 or 30 feet above the water, and a considerable distance in front of the crow's nest, which was at least 60 feet above the water, so that the maintenance of lookouts only from the bridge located about 200 feet aft the stem of the steamer and from the crow's nest was insufficient.

12. COLLISION &⟶80—Fog—VESSEL AT FAULT.

A steamer which ran down a schooner in a fog held solely at fault, proceeding at an excessive speed without proper lookouts, the schooner not being at fault in failing to give signals and exhibit her flare-up light seasonably, so full damages should be assessed against the steamer.

13. COLLISION &⟶44—COURSE.

A sailing vessel, closehauled or jogging within the rules of navigation should, on being approached by a steamer, hold her course.

14. ADMIRALTY &⟶76—PROCEEDINGS—EVIDENCE—"CUMULATIVE."

The deposition of one of the crew of a sailing vessel run down by the steamer libeled as to his discovery of the presence of the steamer is not cumulative within Rule 14, par. 7 (150 Fed. xl, 79 C. C. A. xl) for Circuit Court of Appeals for First Circuit, declaring that further proof in instant causes in admiralty shall include only that which could not, with diligence, have been had at the trial below, etc., except by order of court first obtained, and that merely cumulative proof shall not be so taken, though the facts deposed appeared in the testimony of another witness.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Cumulative Evidence.]

15. ADMIRALTY &⟶21—ACTIONS—WRONGFUL DEATH.

Where a Massachusetts schooner was run down and sunk by a British steamer on the high seas, there is no right of action for the wrongful death of those of the crew of the schooner lost, Rev. Laws Mass. 1902, c. 171, as amended by St. 1907, c. 375, giving a right of action for wrongful death, having no application, for to give it application would be giving the statute extraterritorial effect.

16. ADMIRALTY ☞21—ACTIONS—WRONGFUL DEATH.

General admiralty law affords no recovery for death occurring on the high seas.

Bingham, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the District of Massachusetts; Jas. M. Morton, Jr., Judge.

Libel by Sylvanus Smith & Co., Incorporated, against the steamship Sagamore, claimed by Alexander Fenton, together with libels by Sarah J. Doggett, as administratrix of the estates of John A. Doggett and another, against the White Diamond Steamship Company, Limited, and by Guy Sullivan, administrator, against the same defendant. From decrees against the several libelants, they appeal. Reversed and remanded, with directions in each case.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for appellants.

Edward E. Blodgett and Albert T. Gould, both of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellees.

Before BINGHAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge. These are appeals from the decision of the District Court that the British steamer Sagamore was not in fault for a collision, in a dense fog, with the fishing schooner Olympia, about 2:30 a. m., June 17, 1913, off the coast of Nova Scotia, between 40 and 50 miles south of Sable Island and in the vicinity of the Grand Banks.

The schooner was on the starboard tack, on a course nearly at a right angle to that of the steamer, and was struck on her port side aft the mainmast, and so deeply cut that she sank in a few minutes. Of her crew of 14 the master and 5 men were drowned. Eight men succeeded in boarding the steamer while the vessels hung together, and before the schooner sank.

The primary question is whether the Sagamore, before the collision, was going, as required by article 16 of the International Rules, "at a moderate speed having due regard to the existing circumstances and conditions."

[1] The Sagamore, length 430 feet, beam 47 feet, normal speed 12 or 13 knots, on a voyage from Liverpool to Boston, ran into a dense fog about 2 a. m., half an hour before the collision. She was then in a part of the ocean where her officers well knew that fishing vessels were usually found, and where special precautions for discovering and avoiding them were necessary. Her speed was reduced from 12 or 13 knots to slow speed, which she held until a single blast of the horn of the Olympia was heard, a few moments before the collision. The District Court found the reduced speed to be about 5 knots. The answer to libelants' interrogatories gave her speed about 5½ knots. This was sworn to October 29, 1913, by her master, Alexander Fenton, as claimant. Subsequently, on March 4, 1914, on the

witness stand, he put the speed at about 5 knots, with the explanation that his answer to interrogatories was on the assumption that the engines were making 32 turns, and that he subsequently learned that they were making but 30 turns. Upon so critical an issue of fact the admissions in pleading must be given weight. Rarely does a party defendant on such an issue make statements too favorable to the libelant. The Serapis (D. C.) 37 Fed. 436, 442; Benedict's Admiralty (3d Ed.), §§ 518, 519. Under the English practice, the "Preliminary Act," the object of which is to obtain from the parties statements of facts at a time when they are fresh in their recollection as a rule, cannot be subsequently amended. O 19, r 28, 224.

Without attributing to the master "more coloring than an upright man may insensibly give to facts in which his interest and feelings are involved" (Hutson v. Jordan, 1 Ware, 393; Fed. Cas. No. 6959), and after consideration of the other proofs, we are of the opinion that the claimant's original admission was not made inadvisedly, and that the general speed for the half hour before collision was not less than 5½ knots.

[2, 3] It was found by the District Court, and is conceded by the appellee, that the night was so dark and the fog so dense that, while going at this rate, the discovery of the lights of other ships could not be relied upon to enable the Sagamore to avoid collision by stopping and reversing. The District Court says, "Sight, as both sides agree, was of little use in avoiding collision;" and this, under the conditions, seems true if the Sagamore was going at a speed as high even as 5 knots. In the opinion of the District Court it is said:

"It is urged that the steamer was at fault whatever her actual speed may have been, because she was unable to stop within the distance over which other vessels could be seen. There are expressions in opinions entitled to great weight which support that view; there are other decisions which are inconsistent with it; and the weight of authority seems to me now to be against it."

This is assigned as error. Should we apply the rule that speed such that another vessel cannot be seen in time to avoid her is unlawful, the Sagamore must be condemned for a violation of article 16. In The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 615 [41 L. Ed. 1053] it is said:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained," etc.

In The Chattahoochee, 173 U. S. 510, 548, 19 Sup. Ct. 491, 494 [43 L. Ed. 801]:

"It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

In The Nacoochee, 137 U. S. 330, 339, 11 Sup. Ct. 122, 125 [34 L. Ed. 687], the statement is that the steamer—

"was bound * * * to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog."

The latest expression of an English court applying article 16 that has been brought to our attention is in The Counsellor, L. R. Prob. Div. 1913, pp. 70, 72, 73:

"I think a very fair rule to make is this, and it is one that has been suggested to me by one of the Elder Brethren: You ought not to go so fast in a fog that you cannot pull up within the distance that you can see. If you cannot see more than 400 feet, you ought to be going at such a speed that you can pull up. If you are going in a fog at such a speed that you cannot pull up in time if anything requires you to pull up, you are going too fast. If you cannot retain steerageway at such a speed, then you should manage by alternately stopping and putting the engines ahead. In my opinion 4½ knots was, in the circumstances of the case, too great a speed for the Counsellor to proceed at."

See, also, Marsden's Collisions at Sea (6th Ed.) p. 374; Hayne's Rule of the Road at Sea, pp. 18, 64; The Michigan, 63 Fed. 280, 287, 11 C. C. A. 187; The Nymphæa (D. C.) 84 Fed. 711, 715; The Newport News, 105 Fed. 389, 44 C. C. A. 541; The West Brooklyn (D. C.) 106 Fed. 751, 752; The George W. Roby, 111 Fed. 601, 610, 49 C. C. A. 481; The Belgian King, 125 Fed. 869, 60 C. C. A. 451; The Georgia (D. C.) 208 Fed. 635; The Kentucky (D. C.) 148 Fed. 500, 502; The Bayonne, 213 Fed. 216, 217, 129 C. C. A. 560; The Hilton (D. C.) 213 Fed. 997, 1001; The Rosaleen, 214 Fed. 252, 254, 130 C. C. A. 622; The Port Johnson Towing Co., 232 Fed. 141, 146 C. C. A. 333; The Manchioneal, 243 Fed. 801, —— C. C. A. ——; The Robert M. Thompson, 244 Fed. 662, 671, —— C. C. A. ——; The Etruria, 147 Fed. 216, 77 C. C. A. 442; U. S. Compiled Stats. 1916, vol. 7, § 7854, note 5; section 7889, note 11; "Modern Seamanship," Knight, pp. 254–259, 304.

It appears that there is a very general tendency to apply strictly, and without qualification, the rule that was rejected by the District Court, and we think that the later cases interpret the decisions in The Chattahoochee and The Umbria as in practical agreement with the statement in The Counsellor. Nevertheless, the claimant's contention that this rule has not been fully adopted by the Supreme Court itself, and that it is unreasonable, requires consideration.

The view expressed in Hughes on Admiralty, p. 227, is that the rule does not seem to be a satisfactory or practical test, since a fog may be so thick that one can hardly see the stem of his own vessel, much less an approaching vessel, even though only a few yards off; hence the rule carried to its logical consequences would require the vessel to cease to move; and then, as was pointed out in The Colorado, 91 U. S. 692, 23 L. Ed. 379, danger still attends her, as other vessels may come upon her. "Perfect security under such circumstances is impossible."

But in The Chattahoochee, 173 U. S. at page 548, 19 Sup. Ct. 491, 43 L. Ed. 801, it seems to be recognized that what is demanded is a slackening of speed to the lowest rate consistent with good steerageway; and in The Umbria, 166 U. S. at page 412, 17 Sup. Ct. at page 614 [41 L. Ed. 1053], it was expressly decided:

"As the general speed of the Ivernia did not exceed 4 knots an hour, the lowest speed necessary to the maintenance of steerageway, it is clear that she was guilty of no violation of the thirteenth article"—i. e., article 13 of Revised International Regulations of 1885, 23 Stats. 438.

The claimant contends that the true criterion is expressed in The Zadock, 9 Prob. Div. 116:

"It is the duty of the ship, whether she be a sailing vessel or a steamer, to moderate her speed as much as she can, yet leaving herself with the capacity of being properly steered."

In The Colorado, 91 U. S. 692, 23 L. Ed. 379, and in The Martello, 153 U. S. 70, 14 Sup. Ct. 723, 38 L. Ed. 637, "the lowest rate of speed consistent with steerageway" seems to be regarded as the "moderate speed" required under such conditions. But this formula also is subject to qualification. The inability of a particular vessel to go slow and still maintain steerageway is not an excuse. Were it to be adopted, the rule of moderate speed might be modified by shipbuilders.

In The Pennsylvania, 19 Wall. 125, 134, 22 L. Ed. 148, it was contended that a rate of 7 knots was necessary for safe steerage. The court found against this contention as matter of fact, but said:

"And even if it were true that such a rate was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and where the probability of encountering other vessels was so great. It would rather have been her duty to lay to."

Furthermore, the lowest rate of speed resulting from a continuous operation of her engines at slow speed is not necessarily the lowest rate consistent with good steerageway. As was pointed out in the quotation from The Counsellor, supra, the alternate stopping and putting ahead of the engines will reduce speed below that of continuous operation of the engines. So in The Campania, 9 Asp. Mar. Cas. N. S. 151, 177:

"But if a vessel cannot reduce her speed sufficiently with the continuous action of her engines, and therefore cannot go at what would be a reasonable speed in a fog without occasionally stopping her engines, it is her duty to occasionally stop them. * * * They [masters] hate and abhor the very idea, but it is to my mind their duty to do so if they cannot otherwise reduce the speed sufficiently."

See, also, The Oregon (D. C.) 27 Fed. 751, 752; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4335.

As the Sagamore's engines were operated continuously during a period of half an hour before the collision, it cannot be said that she moderated her general speed to the lowest point consistent with good steerageway, if, as has been held, the expedient of alternately stopping and putting her engines ahead is a practical expedient for maintaining control while reducing the rate of speed. If such in-

termittent operation is practical, the criticism that the rule is impractical that requires ability to stop in time to avoid a collision after the other vessel comes in sight is much lessened in force, though not entirely obviated.

"It is a common excuse that the ship was going as slowly as she could; that she would not steer, or that her engines would not turn over if she had tried to go slower;" but the answers to this are that, if so constructed that she cannot go at a moderate speed, she navigates at her own risk, and that she may occasionally stop her engines. See Marsden's Collisions at Sea (6th Ed.) pp. 377, 378.

In the late decision of the Supreme Court, Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726, it appears that the Selja's half speed was 6 knots and was reduced to slow speed, 3 knots. In The Umbria the general speed of the Iduna was 4 knots, which was approved. In The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637, the lowest speed consistent with good steerageway was found to be 3 miles an hour. See, also, cases cited in Marsden's Collisions at Sea (6th Ed.) 375.

Upon the whole we must agree with the appellants' contention that the Sagamore could have run slower than 5 or 5½ knots without loss of control. It is true that the expression, "having careful regard for the existing circumstances and conditions," gives to the navigator some discretion as to what shall be moderate speed. Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726.

The learned District Judge said:

"It seems to me that persons familiar with navigation at sea would undoubtedly hold the Sagamore free from fault with respect to her speed"

—and upon the circumstances was himself strongly of opinion that her speed was proper.

We have no doubt that among navigators many would agree with the District Court's conclusion. On the other hand, we think that the standard of caution established by the judgments of maritime courts in interpreting the international rules is higher than is acceptable to the masters, who feel justified in assuming rates of speed that have been condemned by the courts, as appears by the numerous decisions collated in United States Compiled Statutes 1916, vol. 7, § 7854, note 10; section 7889, notes 4, 11.

[4] In cases like the present the risk to the steamer is comparatively slight. The risk to the small vessel of the fishermen and to their lives is great; and, though their presence in the pathway of the commerce of the sea may impede the speed of steamers, the courts must strictly interpret the rules which afford protection to their lives and their calling. See The Hansa, 5 Ben. 501, 525, Fed. Cas. No. 6037.

[5] The discretion of the navigator in the matter of speed in a fog must be exercised not wholly as a matter of individual judgment or of individual views as to what is moderate speed, but also with due regard to the interpretation of the term "moderate speed" by the maritime courts and to the general standards of good seamanship established by those courts in applying the term "moderate speed."

"These rules, or sea laws defining precautions required by good seamanship and cautious navigation are to be deduced from the decisions of courts of admiralty, and are not to be regarded as superseded except in so far as they are inconsistent with statutory regulations. The George M. Roby, 111 Fed. 610 [49 C. C. A. 481] C. C. A. 3d Cir.; The Sea Gull, 23 Wall. 165, 173 [23 L. Ed. 90]."

[6, 7] The opinion of the District Court states:

"But here it was night and black fog. Sight, as both sides agree, was of little use in avoiding collision. Both the steamer and the schooner were relying almost wholly upon sound to warn them of other vessels."

What has been termed the "rule of sight" or of "seeing-distance" as a test of proper speed, as stated in the above quotations from the opinions in The Umbria, The Chattahoochee, The Nacoochee, and The Counsellor, omits any reference to the presence or absence of sound signals as an element for consideration upon the question whether a general rate of speed was moderate or excessive. In The Umbria, The Chattahoochee and The Counsellor signals had been heard, and in The Nacoochee the presence of the schooner and the likelihood of encountering her was known.

Upon the facts in all of these cases the speed condemned was a general speed maintained after knowledge of the presence of other vessels, and not, as in the present case, a general rate of speed maintained without warning by sound of the actual presence of another vessel.

In Mr. Haynes' valuable manual, The Rule of the Road at Sea, p. 64, it is said:

"The test of moderate speed in all cases is the ability of the vessel to stop her headway in the presence of danger."

The immediate presence of danger in a dense fog should ordinarily be made known, if the vessels perform their statutory duty of giving sound signals, at a moment much earlier than the time of sighting; and article 16 recognizes that a higher degree of caution arises upon hearing a signal than before.

"The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him." Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726.

While we are unable to agree with the opinion of the District Court that the weight of authority is against the "rule of sight" as a test of moderate speed, we think that it may be said that the expressions of this rule above cited were made in cases where a rate of speed was maintained with knowledge of the presence of other vessels.

There are weighty reasons for the view that in considering whether there has been a compliance with the general rule of moderate speed in a fog as expressed in paragraph 1 of article 16, and a proper exercise of the discretion of the navigator as to general speed, one of the conditions to be taken into account is the statutory requirement that proper signals be given by other vessels. So important a requirement of law and of practical experience for the purpose of giving other ves-

sels more time for control and for maneuvering than they can have in the absence of sight should not be ignored. As a vessel's power of stopping is relevant in considering her speed in a fog (Marsden's Collisions at Sea [6th Ed.] p. 374), the time which she may reasonably expect to have for exercising this power seems a necessary element of the problem.

"The navigator is entitled to proceed in expectation of compliance on the part of others with the law in respect to fog signals as recognized in the second provision of the above-quoted rule,"—i. e., rule 15, Act Feb. 8, 1895, 28 Stats. 648 (Comp. St. 1916, § 7925); Erie & Western W. Co. v. City of Chicago, 178 Fed. 42, 49, 101 C. C. A. 170 (C. C. A. 7th Cir.), citing Casement v. Brown, 148 U. S. 615, 13 Sup. Ct. 672, 37 L. Ed. 582, and The Victory v. The Plymothian, 168 U. S. 410, 426, 18 Sup. Ct. 149, 42 L. Ed. 519, cases which seem to support the general proposition that a vessel is entitled to presume that another vessel will act lawfully, though these are not fog cases.

In The Michigan (D. C.) 63 Fed. 295, the court applied the following rule:

"Moderate speed in a fog is that rate which will permit a steamer to stop, after hearing a fog signal, in time to avoid the vessel which has complied with the law in giving it."

The judgment was reversed in 63 Fed. 280, 11 C. C. A. 187, though without express comment on this rule.

In Marsden on Collisions, p. 37, it is said:

"And from the English decisions it appears that the rate must be regulated by the thickness of the fog, and the probability of falling in with other ships, rather than the supposed distance at which a horn or bell would be audible."

As a practical matter, however, there is a difference between the general probability that vessels may be in the vicinity and the special probability of meeting a vessel whose presence is known though her exact location is not; and this is recognized by article 16 in its provision for stopping the engines, etc., upon hearing a fog signal forward of the beam.

The impracticability of a rule that a steamer may go at a rate such as will enable her to stop within an assumed distance at which she may, under favorable circumstances, expect to hear a fog horn or a steam whistle if blown, is emphasized in The Hansa, 5 Ben. 501, 535, et seq., Fed. Cas. No. 6,037.

While it is apparent that the discretion of the navigator as to speed will be affected by reliance upon the performance of other vessels of their statutory duty to signal in a fog, thus giving him time to act, it seems doubtful, upon the authorities, whether it is practical to attempt to modify the rule stated in the Umbria, Chattahoochee, Nacoochee, and Counsellor (even though theoretically it is justly subject to criticism, as is pointed out in Hughes on Admiralty), except by reading it in conjunction with the requirements stated in The Colorado, 91 U. S. 692, 23 L. Ed. 379, "Very slow speed, just sufficient to subject the vessel to the command of her helm," and in The Martello, 153 U. S. 64,

14 Sup. Ct. 733, 38 L. Ed. 637, "Reduce her speed to the lowest point consistent with good steerageway."

In a fog so dense as existed in this case the right to maintain steerageway and the obligation to go so slow as to be able to avoid a vessel which can be sighted approach inconsistency; but both rules are to be applied so far as is possible. See Mason v. U. S., U. S. Supreme Court, June 4, 1917, 244 U. S. 362, 37 Sup. Ct. 621, 61 L. Ed. 1198. Each of the international rules is to be understood as forming a part of the entire body of precautionary aids to mariners, and not as though each point stood separate and alone. They must be construed in a nautical sense, and understood in a nautical sense, and applied as seamen understand and apply them. Haynes' The Rule of the Road at Sea, p. 1.

In The Lepanto (D. C.) 21 Fed. 651, it was said by Judge Addison Brown:

"No steamer's speed can be held 'moderate' that does admit of her coming to a full stop within her share of the distance that separates her from another, after the latter's whistle is audible."

[8] In the present case the steamer heard but a single blast from the schooner's fog horn, although the evidence is that she was sounding it as required. The District Court found the schooner at fault, however, for failing promptly to turn her fog horn toward the approaching steamer.

The schooner Olympia had a proper mechanical fog horn on top of the windlass, secured by two or three turns of a rope. According to the testimony, it is usual to so secure the horn. Upon seeing the headlight of the Sagamore, Dyer, the lookout, took the lashing off and pointed the horn toward her, and blew it continuously until a few seconds before the collision, when he took to the rigging to save his life.

We are aware of no decision or authority which has imposed upon a vessel provided with a proper mechanical horn the duty of unfastening it and of turning it toward an approaching vessel, or which has condemned the practice of lashing it. See The Trave, 68 Fed. 390, 391, 392, 15 C. C. A. 485; The Niagara (D. C.) 77 Fed. 329, 332. Had there been no evidence in the case that the fog horn was unlashed, we doubt if there would have been any charge of fault for a failure to do so. Evidence of this act of special diligence, however, is met by the criticism that the vessel failed in its duty because it was not done sooner. It is found that Dyer, the lookout, did this as soon as he became aware of the presence of the steamer. Personally, therefore, he was not negligent, but diligent.

It was found by the District Court that the first signal from the steamer was heard by Verge, who was stationed aft on the schooner, nearly a minute before Dyer discovered the presence of the steamer by sight of her headlight, and that Verge was plainly negligent in not informing Dyer that he (Verge) had heard a steamer's signal dead to leeward, and that if he had done so, and Dyer had promptly turned the horn in that direction, the Sagamore would have learned of the schooner's presence in time to have avoided the collision.

Dyer, the lookout, testified, however, that he saw the headlight of the steamer after Verge spoke to him, and said he (Verge) heard a horn. We are of the opinion that the basis of fact for this finding of fault is insufficient.

It is apparent that the steamer, during her approach to the point where the courses crossed, must have been well forward of the beam of the Olympia, and that the wind tended to carry the schooner's signals toward her. The first sound heard from the Sagamore was faint, and until it was definitely located it could not be known whether a change of the direction of pointing the horn would be desirable. We do not think the evidence justified a finding, either that it became the duty of the schooner to unlash and turn her horn, or that, had this act of diligence been done earlier, it would have affected the result. While the blasts of a fog horn, as was said by Judge Addison Brown, in The Patria (D. C.) 92 Fed. 411, "unlike those of a steam whistle, are more especially operative along a particular axis, which much diminishes their penetration outside of the limited arc towards which the horn happens to be directed," and while, under some circumstances, this might call for a change of the direction in the pointing of the fog horn, for example, when signals are heard from an overtaking vessel, or to windward, yet, as we have said, we are not satisfied that, under the conditions, the Olympia can justly be found at fault for any delay, or for failure to give such signals as were required of her.

[9] The Sagamore, before sighting the schooner, had received warning of her presence by a single faint blast of a fog horn nearly ahead; but either the steamer's speed was such that she was unable to stop before crossing the schooner's course, or she did not reverse full speed astern as soon as possible.

Webb, second officer of the Sagamore, testified that directly he heard the fog horn he ordered the wheel hard aport and stopped his engines. Capt. Fenton was not then on the bridge, but ran up the stairs from the chartroom door below upon hearing the schooner's horn, and immediately knocked the lever hard astern. The lookout reported "fog horn right ahead," and rang the bell.

A question of fact arises as to the delay in reversing. It is contended that there was a delay of 20 seconds, and that this was fatal.

The fact that Webb, upon the lookout's report, immediately put the wheel hard aport shows that he did not delay in order to locate the schooner, but accepted the location as indicated by that report. There was at least the delay caused by the fact that the master was not on the bridge, but had to ascend the stairs, and there was some conversation between Webb and the master.

Jones, the engineer, estimated by looking at the clock that the time between the order to stop and the order to reverse was 20 seconds. Taylor, the first engineer, says that he got the order to stop, executed it, and then put down the time on the board by the side of the telegraph, which was about two yards from the lever; that he had just done that when the order "full astern" came; that both orders were within the same half minute. Both orders were put down at 2.29.

The testimony shows that the order to stop and to reverse full speed

247 F.—48

astern could have been executed simultaneously. As the wheel was put hard aport at the same time with the order to stop, the delay in reversing is not explainable upon the theory that time was necessary to locate the schooner before reversing. But upon this issue, as well as others, as the steamer did not keep clear of the sailing vessel the burden is upon, and the presumption against, the steamer; and we are not satisfied that she has affirmatively shown that the steamer did all that it was possible to do to avoid the schooner. Her speed was such as to cause the navigator to port her helm and stop her engines immediately upon hearing the schooner's horn. The porting of the helm, immediately upon hearing the fog horn, shows that collision was then considered imminent, and tends to show that the general speed at this time was excessive.

[10, 11] The Sagamore is further charged with fault in not having a sufficient deck watch, and especially in not having a lookout, or lookouts, forward on the forecastle head.

The density of the fog and the likelihood of encountering fishing vessels called for the utmost diligence in respect to deck watch and lookout.

The Sagamore's upper bridge is located from 200 to 210 feet aft her stem. It is 40 feet above the water, and 46 feet in length athwartship. Both foremast and mainmast are forward of the bridge. The crow's nest is on the foremast, 70 feet aft the stem, and about 60 feet above the water. The pilot house is just aft the upper bridge, on the same level. The chartroom is on the lower bridge, 8 feet below and immediately underneath the navigating bridge.

When the Olympia's horn was first heard, a lookout, Williamson, was in the crow's nest, Webb, the navigating officer, was on the upper bridge, with Evans, an apprentice, and Capt. Fenton, the master of the Sagamore, stood inside the entrance to the chartroom on the lower bridge. Black, the wheelman, was in the pilot house.

The District Court was of the opinion that the sufficiency of the steamer's lookouts is to be tested, not by how they were posted for seeing, but by how they were posted for hearing; that upon the undisputed evidence the crow's nest was a much better place to hear sound under the conditions prevailing on the night in question; i. e., a moderate sea, a head wind and a quiet forward deck, etc. The court was further of the opinion that a man stationed in the stem could not have seen the schooner until she was so close aboard as to be practically in collision, and that he could not have heard a fog signal as well as Williamson.

We are unable to exonerate the steamer from fault in respect to lookouts. A lookout is both the "eyes and ears of the ship." A lookout at the forecastle head would have been but 25 or 30 feet above the water, and much nearer the schooner. The collision was in June, and there was no severity of weather to justify departure from ordinary practice.

In Eastern Dredging Co. v. Winnisimmet Co., 162 Fed. 860, 861, 89 C. C. A. 550, 551, this court said:

"The Supreme Court has been constantly rigid in holding vessels to maintaining lookouts as far forward and as near the water as possible."

The denser the fog and the worse the weather the greater the cause for vigilance. A ship cannot be heard to say that a lookout was of no use because the weather was so thick that another ship could not be seen until actually in collision. Marsden on Collisions at Sea (6th Ed.) 472, 474.

In Watts v. U. S. (D. C.) 123 Fed. 105, it was held the duty of the ship to maintain lookouts both as far forward and as near the water as possible, and also a lookout aloft.

In the present case, we are of the opinion that while the stationing of a lookout in the crow's nest was a proper precaution, yet this did not justify the withdrawal of the lookout or lookouts from the ordinary station on the bow. Great difficulty in seeing does not justify abandonment of efforts to see, but, on the contrary, requires the stationing of men "to see if they can see." See Watts v. U. S. (D. C.) 123 Fed. 108, Q. 35; "Modern Seamanship," Knight, pp. 252, 306.

It was in evidence that in the presence of ice it was customary for the Sagamore to double her lookouts, but this precaution for her own safety was equally required for the safety of other vessels, especially fishing vessels, in that part of the seas.

The appellant cites the following cases, which support the contention that, according to the ordinary requirements of good seamanship, a steamer should have at least one lookout in the eyes of the ship: The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Oregon, 158 U. S. 186, 193, 15 Sup. Ct. 804, 39 L. Ed. 943; The Ottawa, 3 Wall. 296, 18 L. Ed. 165; The Michigan, 63 Fed. 280, 281, 288, 11 C. C. A. 187; Eastern Dredging Co. v. Winnisimmet Co., 162 Fed. 860, 861, 89 C. C. A. 550; The Tillicum (D. C.) 217 Fed. 976, 978; The George W. Childs (D. C.) 67 Fed. 267, 272; The Cambridge, 2 Lowell, 21, 22, Fed. Cas. No. 2,334; The Orizaba (D. C.) 57 Fed. 247; The Patria (D. C.) 92 Fed. 414, on appeal 107 Fed. 157, 159, 46 C. C. A. 211; The Vedamore (D. C.) 131 Fed. 154, 156, on appeal 137 Fed. 844, 845, 70 C. C. A. 342; The Prinz Oskar (D. C.) 216 Fed. 233. See, also, The Manchioneal, 243 Fed. 801, 805, —— C. C. A. ——.

The steamer had considerably more than seeing distance in which to bring herself to a full stop by reversing after hearing the schooner's horn, and failed to do so. In spite of the fact that instant porting of the wheel may have been the right maneuver, there was too little time to make it effective, and she struck the schooner with such force as to cut deeply into her and sink her within a few minutes. The steamer was bound to keep clear, and the burden rests upon her to show a sufficient reason for her failure to do so. The Nacoochee, 137 U. S. 330–338, 11 Sup. Ct. 122, 34 L. Ed. 687; Lie v. San Francisco & Portland S. S. Co., 243 U. S. page 298, 37 Sup. Ct. 270, 61 L. Ed. 726.

In our opinion she has failed to exonerate herself from fault.

[12, 13] As bearing upon the question of full or half damages, we must consider further the faults charged to the schooner. We have already said that we are unable to agree that she was at fault for failure to give sound signals. She is also charged with failure to ex-

hibit her flare-up light seasonably. Both of these charges are based upon the supposed delay of Verge, who was stationed aft, in failing to report at once the first sound from the Sagamore's whistle. We have already referred to the testimony of Dyer that he heard Verge report a signal before he (Dyer) saw the steamer's headlight, and unlashed the horn. Upon a careful examination of the entire evidence it appears that Verge, who was stationed aft, immediately upon hearing the steamer's whistle, stepped down into the cabin, a few feet away, and reported to Capt. Doggett and Bennett that he heard a steamer's signal to leeward, and turned right around and went on deck again, with Bennett "right at his heels"; that he was in the cabin but five or six seconds; that coming on deck both he and Bennett saw the steamer's headlight; that Verge shouted "all hands on deck" and ran forward to the forecastle companionway and called the men in the forecastle, while Bennett caught the wheel, threw off the becket, and put the wheel hard up, but without effect. Capt. Doggett lighted the torch in the cabin and passed it out to Bennett, who let go the wheel, took the torch from the captain, and went forward on the port side, exhibiting the torch, and was standing at the dories between the fore and main mast, when the Sagamore struck. He then went up the port rigging, still carrying the torch.

The statement in the opinion of the District Court, "Verge went below to look at the clock and see how near out the watch was," gives a color of inattention and negligence which, in our opinion, is not justified by the evidence, which shows a prompt report to the master, and prompt action in signaling by sound and torch.

The District Court found the schooner at fault only in her failure to exercise the greatest vigilance to apprise other vessels of her whereabouts. The Olympia was hove to, under her mainsail, foresail, and forestaysail, or jumbo. Her jumbo was hauled to windward and her wheel was in a becket, which could be quickly thrown off and the wheel released. She was "jogging," as it is termed, and was a vessel close-hauled, within the rules of navigation. The Ada A. Kennedy (D. C.) 33 Fed. 623; The Ontario, 2 Low. 40, Fed. Cas. No. 10,543; The Columbian, 100 Fed. 991, 992, 41 C. C. A. 150. It was her duty to hold her course, which she did until struck; and when the Sagamore was seen she could have done nothing by a change of helm or of sails to avert the collision, which was then imminent and unavoidable by the schooner. In view of the decision of this court in The Columbian, 100 Fed. 991, 41 C. C. A. 150, we need not consider this question further. We are of the opinion that the Sagamore must be held solely at fault.

[14] The objection to the deposition of Stephen Verge requires brief consideration. We are of the opinion, under the unusual circumstances of the case, and especially as the preliminary statement of Verge was apparently considered by the District Judge, that the deposition of Verge as to the facts of the collision should be received. We think also that his testimony as to the facts and circumstances of the collision is not objectionable as cumulative, but is admissible under rule 14, par. 7 (150 Fed. xl, 79 C. C. A. xl) of this court. The facts that we have stated as to Verge's conduct appear, however, principally in the testimony of Bennett.

In No. 1157, the libel in rem; therefore, we are of the opinion that the judgment of the District Court must be reversed, and that the case be remanded to that court for the entry of a decree finding the Sagamore solely at fault for the collision, and for further proceedings consistent with this opinion.

[15, 16] Cases Nos. 1158 and 1159, libels in personam against the White Diamond Steamship Company, owner of the Sagamore, raise the further question whether a state statute of Massachusetts, creating a right of action to recover for death by wrongful act, applies to the deaths resulting from this collision on the high seas between a British steamer and a vessel owned by a Massachusetts corporation.

The libels for loss of life are based upon chapter 171, Rev. Laws of Mass. 1902, as amended by chapter 375, Laws of 1907. The contention is as follows:

"The schooner Olympia, a Massachusetts vessel, while on the high seas, was a part of the territory of Massachusetts. The deceased seamen were on board the schooner when she went down; and therefore, at the time of their death as much on the territory of Massachusetts, and within the protection of the statute, as if actually upon the shore of Massachusetts."

In The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264, it was decided that until Congress acts on the subject a state may legislate in regard to the duties and liabilities of its citizens and corporations while on the high seas, and not within the territory of any other sovereign.

While the statute "offers a liability" of Massachusetts owners to those injured, it does not follow that it may impose a liability upon citizens of another state who are without its territorial jurisdiction. Its authority over its own ships and citizens does not extend to the ships and citizens of another nation.

In La Bourgogne, 210 U. S. 95, 115, 116, 28 Sup. Ct. 664, 670 [52 L. Ed. 973] it was said:

"If they belonged to different nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum, that is, the maritime law as received and practiced therein, would properly furnish the rule of decision."

See The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Belgenland, 114 U. S. 355, 369, 5 Sup. Ct. 860, 29 L. Ed. 152; The Chattahoochee, 173 U. S. 540, 550, 19 Sup. Ct. 491, 43 L. Ed. 801; The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923; The Brantford City (D. C.) 29 Fed. 373; Lindstrom v. International Nav. Co. (C. C.) 117 Fed. 170.

We are therefore of the opinion that the Massachusetts statute imposes no obligation upon the owners of the Sagamore to make compensation, or to pay a penalty for causing death; and, as the general maritime law affords no recovery for death thus occurring on the high seas, the libels in 1158 and 1159, so far as they seek damages for death, must be dismissed.

We are of the opinion, however, that so far as they seek recovery for personal effects lost through the disaster the libels may be maintained.

In 1157 the judgment of the District Court is reversed, and the case will be remanded to that court for further proceedings consistent with this opinion; with costs to the appellant.

In 1158 the judgment of the District Court is reversed, and the case will be remanded to that court, with direction to enter an interlocutory decree for the loss of personal property and effects of the libelant's respective intestates, and for further proceedings consistent with this opinion; neither party to recover costs of appeal.

In 1159 the judgment of the District Court is reversed, and the case will be remanded to that court, with direction to enter an interlocutory decree for the loss of personal property and effects of the libelant's intestate, and for further proceedings consistent with this opinion; neither party to recover costs of appeal.

BINGHAM, Circuit Judge (dissenting). It seems to me that the decree of the District Court should be affirmed, and for the reasons there stated.