## BOSTON SAND & GRAVEL CO. v. UNITED STATES.

(District Court, D. Massachusetts. April 23, 1924.)

No. 2223.

1. **Collision ⬦82(2)—Steam lighter held solely in fault for collision with a destroyer, which had stopped in a fog.**

A steam lighter in a dense fog was following a government destroyer as they approached a gateway in a submarine net across the channel. The gate was open, but had sagged under the influence of the wind and tide, and had the appearance in the fog of being closed, or partly closed, and on approaching the destroyer stopped, but continued to sound her fog bell. While so stopped the lighter came into collision with her. *Held*, that the destroyer was not in fault, but that the fault was solely that of the lighter, which, knowing that the destroyer was ahead, was under the duty to proceed at such speed that she could be stopped after sighting the destroyer.

2. **United States ⬦125—Issues for determination in suit against United States under special act, stated.**

Under a special act authorizing a suit against the United States, for collision between a privately owned and a government vessel, to be determined "upon the same principle and measure of liability, with cost, as in like cases in admiralty between private parties," the only question for determination is whether the government vessel was in fault, and the United States cannot be charged with liability for acts of negligence having nothing to do with the ownership of such vessel.

In Admiralty. Suit by the Boston Sand & Gravel Company against the United States. Decree for respondent.

Foye M. Murphy and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for libelant.

Robert O. Harris, U. S. Atty., and Laurence Curtis, 2d Sp. Asst. U. S. Atty., both of Boston, Mass.

BREWSTER, District Judge. This libel is brought under and by virtue of an Act of Congress approved May 15, 1922 (42 Stat. 1590), providing:

"That the claim of the owner of the steam lighter Cornelia, rising out of a collision between said steam lighter and the United States destroyer Bell in Broad Sound, Boston Harbor, Massachusetts, on the 9th day of August, 1918, for and on account of the losses alleged to have been suffered in said collision by the owner of said steam lighter Cornelia by reason of damages to or the loss of said steam lighter, her boats, engines, * * * may be submitted to the United States court for the district of Massachusetts, under and in compliance with the rules of said court sitting as a court of admiralty."

[1] On the morning of August 9, 1918, the Cornelia left East Boston, bound down Boston Harbor for Scituate, Mass. The Cornelia was a steam sand lighter of twin screw type, about 128 feet long, 30 feet beam, and a depth of 10 or 11 feet. On that morning the wind was light northeasterly, the tide was on the early part of the flood, and a fog of variable density had settled over the harbor. The Cornelia proceeded down the Narrows, intending to go out through the North Channel.

For defensive purposes, a submarine net about '500 feet long had been thrown across the channel near buoy 8–C. In this net was a gate about 100 feet long, which swung on buoys placed on the left-hand side of the channel as one passed out to sea. Any outgoing vessel received a signal from a station ship, anchored near Deer Island Light, which informed navigators whether the gate was open and whether the vessel had permission to pass out through it. The Cornelia passed the station ship shortly before 8 o'clock a. m., and received a signal which carried with it permission to pass out through the gate.

As the Cornelia was nearing Deer Island Light, the Bell, a United States destroyer, painted in camouflage colors, was seen by those on board the Cornelia to pass on her starboard side some 150 yards distant. The destroyer had left the Charlestown Navy Yard, and was on its way to sea out through the gate. It had passed the station ship, and had received permission to proceed. It was traveling at that point somewhat faster than the Cornelia, and reached the gate ahead of her. When the vessels were at Deer Island Light, the fog had lifted somewhat; but before the gate had been reached it had shut in, so that the range of visibility was only about 50 or 75 yards.

The Bell proceeded at one-third speed (about 5 or 6 knots) down the North Channel, a little to the left of the gate. The gate had been swung out, and left so that the slack in it, with the action of the tide, caused it to bulge, and, to the officers on the Bell, in the fog, it had the appearance of closing, or partially closing, the opening in the net through which the destroyer was to pass.

In any event, those in charge of navigating the destroyer deemed it prudent to stop. Three blasts of the whistle were given, and the engines were reversed until the Bell had come to a stop, when two blasts of the whistle were given. There was some controversy between witnesses as to whether the Bell had gathered any sternway; but, from all the testimony and from the location of the Bell at the time of the collision, I find that the destroyer had not developed any sternway. The engines were reversed only enough to bring the destroyer to a standstill about 25 yards from the gate.

After a short interval of time, not exceeding two minutes, an officer on the bridge of the Bell sighted the Cornelia about 75 yards away on the port quarter. Immediately the signal was given for "standard speed ahead," and the engines promptly responded to this signal; but, before the destroyer could attain a speed greater than that of the Cornelia, the Cornelia struck the Bell on the starboard quarter, breaking the depth charge sponson and carrying away the starboard propeller guard rail. As a result of the collision, the Cornelia was damaged to such an extent that she sank a few minutes after she had been beached on the side of the channel.

The destroyer was manned by a full complement of officers and seamen. It appeared that some of the men were inexperienced, but competent officers were in charge. Lookouts were stationed on the fantail. The Cornelia, however, was not reported by either of these lookouts, but was first sighted by an officer on the bridge. The bridge was about 215 feet distant from the stern. There was evidence tending to show

that on the morning in question the fog was a low-hanging fog, and that it was possible for the officer on the bridge to see the Cornelia as soon as a lookout on the fantail. There was the usual conflict of testimony respecting fog signals; those on board the Cornelia testifying that they did not hear any from the destroyer, while those on board the destroyer were equally confident that the signals were given. The consideration of all the evidence on this question leads me to the conclusion that the destroyer complied with all the requirements of the Inland Rules and of good seamanship respecting the giving of fog signals at regular intervals, and I so find.

As to the Cornelia, no lookout was stationed on her bow, and with knowledge that the destroyer was ahead she went on at undiminished speed until she struck the destroyer.

The Cornelia was capable of making, under favorable conditions, about 7 knots an hour. On the morning in question her steam pressure was low, so that she was not making anywhere near her maximum speed, but she was running through the fog on full speed bells. The witnesses for the libelant estimated the speed at about 4½ knots.

The Bell was first sighted by the captain in the pilot house of the Cornelia, about 75 feet from her stern, and immediately the helm was ported, which swung her bow slighted to the starboard, but not sufficiently to clear the destroyer. Two witnesses testified that the signal to reverse her engines full speed was given, but the engineer testified that he did not receive the signal, and I find he did not reverse the engines up to the time of the collision. If signals were given, nothing was done pursuant to them to reverse the engine or retard the speed of the Cornelia.

The allegations of fault on the part of the Bell which were principally relied upon at the trial were:

(1) That the lookouts failed to sight and report the Cornelia; and

(2) That upon sighting the Cornelia an order for "standard speed ahead" was given, instead of "full speed ahead."

As to the first allegation, it is true that the approach of the Cornelia was first seen by an officer on the bridge, but the fact that the Bell was at rest, rather than proceeding astern, is controlling. It was clearly the duty of the Cornelia to so regulate her speed that she could stop after first seeing the Bell. The Sagamore, 247 Fed. 743, 159 C. C. A. 601. The destroyer had the right to assume that the Cornelia would observe this rule, and no negligence, therefore, can be attributed to the destroyer from the failure of the fantail lookout to report the Cornelia.

As to the second allegation, I do not find negligence on the part of the navigators of the Bell in the order for "standard speed ahead." I am satisfied upon the evidence that the Bell could get under way and develop a speed equal to that of the Cornelia as quickly under "standard speed ahead" as under "full speed ahead."

None of the allegations of fault alleged by the libelant are sustained by the evidence.

[2] The libelant claimed that under the act which authorized these proceedings it would be entitled to recover if it could show that the

United States was negligent in the construction, maintenance, or operation of the gate in the submarine net, or in permitting the Cornelia to go out.

The respondent, on the other hand, denies the right to recover upon such showing. The act gives the court jurisdiction to determine the controversy "upon the same principle and measure of liability with cost as in like cases in admiralty between private parties." I take these provisions to mean that we must deal with the rights and liabilities of the parties as if the destroyer were owned by a private party. The sole question would be whether the vessel was at fault. This is a libel in personam, and, if the United States is liable at all, it must be liable as the owner of the Bell. We would not be concerned with any duty of the United States growing out of its operation of the net.

While I am therefore inclined to agree with the respondent on this aspect of the case, I have received evidence tending to show the construction of the net, how it is operated, and what the situation was with reference to it on the day of the collision, and from such evidence I am prepared to submit a finding upon the question whether the United States was negligent in operating the gate, or in giving permission for the Cornelia to pass out through it.

The gate was opened by swinging it nearly at right angles with the net and fastening it to buoys. It does not appear that the gate had broken away from its mooring, or that it was closed on the morning in question.

The submarine net was laid down at half tide, and properly so laid. The result was that, when the tide was right, there would be a slack in the gate. This was an inevitable condition. The action of the wind and tide upon this slack caused it to bulge, so that, to one approaching in a dense fog, who could see only a small section of it, its appearance might well lead a navigator to think the gate was closed—at least it would have justified him in stopping to ascertain the true situation. This, I find, was what happened, and it does not, in my opinion, involve the idea of negligence or fault on the part of those operating the gate. The opening in the net was at all times ample to allow the Cornelia to go out, and there seems to have been no occasion for any one advising the Cornelia otherwise.

Libel dismissed.